[No. B060302. Second Dist., Div. Seven. Nov. 9, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
JAVIER FRANCISCO CAMACHO et al., Defendants and Appellants.

**COUNSEL**

George L. Schraer and Robert Derham, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Pamela C. Hamanaka and William H. Davis, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS (Fred), J.**—Appellants were jointly tried but by separate juries. Both appellants were found guilty[1] of kidnapping for robbery (Pen. Code,[2] § 209; count I), attempted forcible oral copulation in concert (§§ 664/288a, subd. (d); count III), second degree robbery (§ 211; count VI), and three counts of forcible rape in concert (§ 264.1; counts II, IV, V). Firearm allegations in connection with all six counts were found true. (§§ 12022, subd. (a)(1), 12022.5, 12022.3, subds. (a) and (b).) Appellant Camacho was also found guilty of second degree robbery (§ 211; count VII), second degree vehicular burglary (§ 459; count VIII), and escape by force (Welf. & Inst. Code, § 871, subd. (b); count IX). Deadly weapon use allegations (§ 12022, subd. (b); counts VII and VIII) were found true.

Both appellants were sentenced to state prison, appellant Camacho for life plus 45 years and 2 months, appellant Mortis for life plus 44 years and 2 months.

Appellants contend (1) the trial court erred by "cross-examining" appellant Mortis; (2) there is insufficient evidence of firearm use regarding counts II, III, IV, and V; and (3) the trial court erred by failing to obtain a youth authority evaluation (Welf. & Inst. Code, § 707.2) before sentencing them to state prison.

We find merit only in the third contention. Accordingly, we affirm the judgments of conviction but reverse both sentences.

### FACTUAL BACKGROUND

There being no insufficiency of evidence claim,[3] the facts may be stated simply. Our perspective favors the judgment. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110].)

---

[1]Appellant Mortis, before trial, pleaded guilty to six counts of escape by force (Welf. & Inst. Code, § 871, subd. (b)), grand theft auto (Pen. Code, § 487h [now § 487, subd. (3)], felony joyriding (Veh. Code, § 10851), and misdemeanor escape (Welf. & Inst. Code, § 871, subd. (a)).

[2]Statutory references, unless otherwise noted, are to the Penal Code.

[3]Appellants do claim the evidence is insufficient regarding certain firearm use allegations. In considering that claim we more fully discuss the evidence.

Twenty-eight-year-old Joanna W. was a driver for Royal Crown Limousine Company.

On Sunday evening, August 7, 1988, she picked up a client and his girlfriend and drove them to a radio station at 3580 Wilshire Boulevard in Los Angeles. The client paid Joanna W. in cash and asked her to return in an hour unless he phoned her sooner. Joanna W. had a mobile phone in the limousine.

Because no parking space was available on Wilshire Boulevard, Joanna W. parked on a well-lit nearby residential street. Leaving the engine running, she got out, removed cleaning supplies from the trunk, entered the passenger compartment, did some cleaning, and then watched a videocassette. When she opened the door to get out, appellant Mortis put "a gun in her face" and told her to get back in the car. She slid across the seat and opened the other door to escape but appellant Camacho was there pointing a gun at her. Appellants entered, sat on either side of Joanna W. and asked where the money and car keys were. She told them.

Appellant Camacho got out, reentered on the driver's side, shut off the rear interior lights, and drove off. He drove onto the freeway and appeared to be following another car.

When appellant Camacho exited the freeway and parked in a residential area a car pulled in front of them. A third man approached and appellants called him "boss." His face was covered with a T-shirt. He entered the limousine.

Someone lifted Joanna W.'s skirt up and told the others to look. She was told to remove her nylons and did so.

Appellant Mortis raped Joanna W. and then tried to force her to orally copulate him but she resisted.

Appellant Camacho, and then the "boss," raped Joanna W.

The men argued about money, with appellant Camacho and the "boss" speaking to each other in Spanish.

The "boss" exited the limousine and apparently left in the other car. Appellants told Joanna W. to lie on the floor and cover her head. Appellant Camacho drove some distance and stopped. Appellants then took Joanna W.'s car phone and beeper and, after dropping the limousine keys on the ground, walked away.

Joanna W. was hysterical. She retrieved the keys, started the limousine, and drove onto the freeway, trying to return to her company in Orange County. When she noticed she was going in the wrong direction she exited and reentered the freeway in the other direction. After a short time she again exited the freeway and drove to a gas station. Still hysterical, she screamed at the cashier to let her in the booth. Instead, the cashier dialed the number—Joanna W.'s employer—and Joanna W. left a message with his answering service that she had been kidnapped, was on her way in, and he should call the police.

Joanna W. resumed driving but soon, sensing she was going into shock, stopped and called her roommate. Her roommate and a friend met Joanna W. and drove her in the limousine to the company location.

Her employer met her there. Joanna W. was crying, nervous, and her clothes, normally very neat, were "all messed up." The inside of the limousine was "a mess": papers were strewn all over the floor, both front and back, and Joanna W.'s shoes and nylons were on the floor.

Sheriff deputies later arrived, secured the limousine, and arranged for a medical-legal examination of Joanna W.

After that night, Joanna W. testified: "I was scared, frightened. I didn't know what to do. I felt violated. And it made me run away. . . . I took a lot of showers. Soaked in tubs for hours. When the nightmares started, I would wake up, and go straight into the shower." Because she did not want to be found by the men, she cut her hair and dyed it jet black.

About a week after the rapes Joanna W. went to her mother's house and told her what had happened. The telling took four to five hours because Joanna W. was hysterical and crying. Thereafter, Joanna W. occasionally slept at her mother's house. She had nightmares and her cries of "No, No" awakened her mother who then came to Joanna W.'s bedroom, held her in her arms, and tried to comfort her. On such occasions, Joanna W. would be bathed in perspiration, would awake wide-eyed and be hysterical. Joanna W. would immediately bathe or shower.

About two months after the offenses, in October 1988, Joanna W. was shown a series of photographs and identified both appellants.

Fingerprint technicians investigated the limousine and its contents and found appellant Mortis's left palm print on the back door, driver's side window. Appellant Camacho's fingerprint was found on one of the pieces of paper in the limousine, minutes of a meeting Joanna W. had attended.

Semen was found on Joanna W.'s shirt and skirt, on a towel she had used after the rapes, on a condom recovered from the limousine floor, and from a vaginal swab taken from Joanna W.

Although at different times, both appellant Camacho and appellant Mortis were arrested at 949 W. 61st Street. After his arrest, appellant Mortis escaped. Thereafter, he returned to the juvenile facility where appellant Camacho was in custody, rammed a car into a security gate, and helped appellant Camacho and five other inmates escape.

Detective Reiser interviewed appellant Mortis concerning the "limousine-driver-kidnap-rape." Appellant Mortis said he knew nothing about it and his prints "must have walked in there."

When appellant Mortis's mother arrived at the station, Detective Reiser told her about the evidence against her son. He then listened from a monitor room while appellant Mortis talked to his mother. Appellant Mortis confessed to his mother that he was one of the three people who robbed the limousine driver and that he was armed with a gun but said only the other two raped her, not him.

On September 11, 1988, about a month after the crimes against Joanna W., Karen L. drove a girlfriend home. It was 4:30 a.m. and a few blocks from where Joanna W. had been kidnapped. Karen L. parked in the driveway, left her lights on, locked her car, and walked her friend to her door. When she returned to her car she saw someone crouching by her driver's door. When Karen L. said "Excuse me, can I help you?," appellant Camacho stood up, said he was stealing her purse and, after threatening her with a heavy metal awl, took seven of her rings and left in a car with an accomplice. Only then did Karen L. notice that her glass sunroof had been smashed, her car door was ajar, and glass was scattered everywhere.

The defense essentially consisted of appellant Mortis's testimony, three and one-half reporter's transcript pages of direct examination. In sum: on August 7, 1988, he sold Joanna W. methamphetamine,[4] as he had done on three prior occasions. That evening, however, she returned—still driving the limousine—and asked for an additional $25 worth on credit. Appellant Mortis, instead of credit, gave her a baggie of amphetamine in exchange for a limousine ride. The ride was brief and uneventful.

Appellant Camacho did not testify. Nor did appellant Mortis's mother.

---

[4]Two baggies of methamphetamine and some residue were found in the limousine. Joanna W. testified that occasionally, to remain alert, she would put amphetamine in her coffee.

## Discussion

1. *Appellants contend the trial court erred by "cross-examining" appellant Mortis.*

Following appellant Mortis's terse direct examination the prosecutor cross-examined him at length, 110 reporter's transcript pages worth. There was no redirect examination and counsel for appellant Camacho asked no questions.

Then, after all counsel had concluded their questioning of appellant Mortis, the trial court questioned him. The questions, answers, attorney objections, and rulings occupy seven pages of reporter's transcript.

Appellants contend the trial court's questions were prejudicial "cross-examination" and "plainly based on the assumption that appellant's testimony was false."

For several reasons we find the contention without merit.

a. *Trial court authority to question witnesses*

The trial judge has a right to question witnesses. (§ 1044;[5] Evid. Code, § 775;[6] *People* v. *Corrigan* (1957) 48 Cal.2d 551, 555 [310 P.2d 953]; *People* v. *Melton* (1988) 206 Cal.App.3d 580, 595 [253 Cal.Rptr. 661].) "The judge may examine a witness at some length . . . ." (3 Witkin, Cal. Evidence (3d ed. 1986) § 1741, p. 1695.)

" 'Ordinarily the proper course . . . is to allow the examination by counsel—direct, cross, redirect and recross—to conclude, and then if anything in the judgment of the trial court remains obscure, which may be material for the jury to know . . . the trial court may . . . intervene.' " (3 Witkin, *op. cit. supra*, at p. 1696, quoting *People* v. *Boggess* (1924) 194 Cal. 212, 241 [228 P. 448].) The examination should be "conducted impartially, so that the jury will not receive improper inferences as to the judge's opinions on the case." (3 Witkin, *op. cit. supra*. at § 1743, p. 1697.)

---

[5]The section provides: "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

[6]The section provides: "The court, on its own motion or on the motion of any party, may call witnesses and interrogate them the same as if they had been produced by a party to the action, and the parties may object to the questions asked and the evidence adduced the same as if such witnesses were called and examined by an adverse party. Such witnesses may be cross-examined by all parties to the action in such order as the court directs."

## b. *Failure of appellants to timely and specifically object*

■■■ To obtain appellate review of claimed prejudicial "cross-examination" by the trial court, appellants must have timely and specifically objected to that examination. (Evid. Code, § 353; *People* v. *Corrigan, supra,* 48 Cal.2d 551, 556; *People* v. *Worthy* (1980) 109 Cal.App.3d 514, 527 [167 Cal.Rptr. 402]; see also *People* v. *Ramos* (1982) 30 Cal.3d 553, 576 [180 Cal.Rptr. 266, 639 P.2d 908] revd. on other grounds by *California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446] [judge's comments during jury voir dire]; *People* v. *Boyette* (1988) 201 Cal.App.3d 1527, 1538 [247 Cal.Rptr. 795] [judge introduced child witness to jury after determining the witness was competent]; *People* v. *Melton* (1988) 44 Cal.3d 713, 753 [244 Cal.Rptr. 867, 750 P.2d 741] [judge made jesting comments].) They did not do so. To the court's approximately 30 questions only 5 objections were made ("calls for speculation" [twice], no question pending, vague, and misstates the evidence). Two were sustained, a third caused the trial court to rephrase his question, and a fourth resulted in the question not being answered. No objection suggested the trial court was conducting "cross-examination" or expressing an "opinion on the case."

Only after the trial court had concluded its questioning, and *after* recross-examination by the prosecutor, did defense counsel object that the trial court had singled out appellant Mortis by questioning his credibility. Counsel not only did not request a curative admonition but rejected the court's offer to give one.[7] The only relief counsel for appellants requested was a mistrial. The trial court denied the mistrial motion.

Appellants, by waiting until after the trial court had *concluded* its questioning and after the prosecutor had concluded his recross-examination, failed to timely object to trial court "cross-examination." (Evid. Code, § 353.)

## c. *Nature of trial court's examination.*

Contrary to appellants' contention, the trial court's questions were not adversarial nor "designed to establish reasons to disbelieve appellant [Mortis]."

The trial court did not interrupt direct examination, allowed all counsel to conclude their examination, and then asked only nonargumentative questions of appellant Mortis.

---

[7]The trial court did admonish the jury to draw no inferences from its questioning of appellant Mortis.

As to the trial court's initial questions, the prosecutor had more ground for complaint than did appellants. On cross-examination the prosecutor had painstakingly elicited from appellant Mortis that the limousine ride had been "wonderful," that both he and appellant Camacho (whom appellant Mortis had invited along) had thanked Joanna W., and when they parted Joanna W. was smiling. Deliberately unasked by the prosecutor, and thus preserved for argument, was *why would Joanna W. falsely accuse appellants of kidnapping, raping, and robbing her.*

Seemingly oblivious to this purposeful omission, the trial court began its questioning as follows:

"Q Mr. Mortis, you left the victim on good terms, Joanna, that evening?

"A Yes.

"Q Why do you think she would make up a story that you raped her, along with Mr. Camacho and someone else?

"Mr. Sperber [counsel for appellant Mortis]: Objection, Your Honor. That would call for speculation, why she would make up any story.

"The Court: Overruled.

"Q By the Court: Do you have any reason? Did you ever burn her in a drug deal[?]

"Mr. Barish [counsel for appellant Camacho]: Your Honor, I join in that objection.

"The Witness: No."

The remainder of the trial court's questions were collateral ("What else [besides a bow tie] did [Joanna W.] have on?; "When Joanna purchased the drugs from you, did you see where she put them?"), repetitious of prosecutor questions ("Why did she come back?' "Did she tell you why she wanted a third package?"; "How did she pay you?"), and without apparent effect.[8]

We find no abuse of discretion or prejudice in the trial court's questioning of appellant Mortis. (See *People v. Ottey* (1936) 5 Cal.2d 714, 720-721 [56 P.2d 193]; *People v. Carlucci* (1979) 23 Cal.3d 249 [152 Cal.Rptr. 439, 590 P.2d 15]; *People v. Huff* (1955) 134 Cal.App.2d 182 [285 P.2d 17] [trial

---

[8]In jury argument, no counsel referred to anything asked by the trial court.

court committed prejudicial error by cross-examining defendant, interrupting defense counsel's argument, and making comments adverse to defendant].)

2. *Appellants contend there is insufficient evidence of firearm use regarding the sexual offenses against Joanna W. (counts II, III, IV, and V).*

■ Appellants concede the evidence is sufficient that they "used a firearm" during the commission of counts I (kidnapping for robbery) and VI (robbery) but not for the sexual offenses against Joanna W. (counts II, III, IV, and V). We disagree.

■ "By employing the term 'uses' instead of 'while armed' the Legislature requires something more than merely being armed. . . . One who is armed with a concealed weapon may have the potential to harm or threaten harm to the victim and those who might attempt to interrupt the commission of the crime or effect an arrest. . . . Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' . . . The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." (*People* v. *Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024], internal citations omitted.)

■ *People* v. *Turner* (1983) 145 Cal.App.3d 658 [193 Cal.Rptr. 614] is apposite. The defendant displayed a gun in order to kidnap the victim but then placed the gun down, although within reach, and sexually assaulted her. In upholding the sexual assault "use" finding the Court of Appeal stated: "Where the victim is sufficiently frightened by the use of a weapon such that it becomes unnecessary to continually display the weapon during the course of later crimes against that victim within a brief span of time, a use finding . . . is proper." (*Id.* at p. 685.)

Appellants, like the defendant in *Turner*, "sufficiently frightened" Joanna W. by displaying their guns and threatening to kill her. It was unnecessary thereafter "to continually display" their guns. As Joanna W. testified, "Well, I didn't really want to push them, because I knew there were guns. And I did not want to fight, because they told me if I fought them, or if I looked at them, they were going to kill me."

*People* v. *Funtanilla* (1991) 1 Cal.App.4th 326 [1 Cal.Rptr.2d 875], upon which appellants rely, is distinguishable. Defendant took the victim into a

bedroom, displayed a gun, and raped the victim. He then left the bedroom and later when he returned he wore only undershorts and did *not* have his gun. The sexual assaults he then committed were held not to be with the "use" of a firearm.

Unlike *Funtanilla*, appellants never left the limousine during the sexual assaults, and the victim reasonably believed they had instant access to their firearms.

3. *Appellants contend the trial court erred by failing to obtain a Youth Authority evaluation pursuant to Welfare and Institutions Code section 707.2.*

Welfare and Institutions Code section 707.2[9] provides, in part: "No minor who was under the age of 18 years when he committed any criminal offense . . . shall be sentenced to the state prison unless he has first been remanded to the custody of the Youth Authority for evaluation and report pursuant to this section."

At the time of the instant offenses appellant Mortis was 16 years old and appellant Camacho 17 years old.

The trial court declined to obtain a Welfare and Institutions Code section 707.2 evaluation report. It relied upon *People* v. *Garcia* (1981) 115 Cal.App.3d 85 [171 Cal.Rptr. 169] which held "The trial court need not . . . remand a minor defendant to the Youth Authority prior to sentencing the minor to state prison if the convicted minor is not eligible for . . . the Youth Authority." (*Id.* at p. 109.)

The trial court reasoned that since appellants, having been convicted of kidnapping for ransom, were subject to "imprisonment for life" and thus ineligible for commitment to the Youth Authority (Welf. & Inst. Code, § 1731.5, subd. (a)(2)), no presentence evaluation was required. The trial court was mistaken.

---

[9]In its entirety, the section provides: "Prior to sentence, the court of criminal jurisdiction may remand the minor to the custody of the Youth Authority for not to exceed 90 days for the purpose of evaluation and report concerning his amenability to training and treatment offered by the Youth Authority. No minor who was under the age of 18 years when he committed any criminal offense and who has been found not a fit and proper subject to be dealt with under the juvenile court law shall be sentenced to the state prison unless he has first been remanded to the custody of the Youth Authority for evaluation and report pursuant to this section.

"The need to protect society, the nature and seriousness of the offense, the interests of justice, the suitability of the minor to the training and treatment offered by the Youth Authority, and the needs of the minor shall be the primary considerations in the court's determination of the appropriate disposition for the minor."

*People* v. *Garcia*, the case upon which the trial court relied, was silently overruled in *People* v. *Marsh* (1984) 36 Cal.3d 134 [202 Cal.Rptr. 92, 679 P.2d 1033].[10] *Marsh* held it was reversible error for the trial court not to obtain a Welfare and Institutions Code section 707.2 evaluation "even when the minor is presently ineligible for [Youth Authority] commitment." (*People* v. *Marsh, supra,* at p. 142.)

We find *People* v. *Marsh* controlling: its facts are indistinguishable (and even more aggravated than in the instant case), its dual rationale applicable (an evaluation may guide trial court discretion under § 1385 and in ordering a youthful offender to be "housed" at the Youth Authority), and its mandate unchanged. (See 3 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 1306, pp. 1521-1522; Cal. Judges Benchbook, Criminal Posttrial Proceedings (1991) § 2.37, pp. 80-81.)

4.  *Other contentions.*

Because we reverse appellants' sentences, we need not address their contention the trial court failed to sufficiently state a reason for imposing full strength consecutive sentences under section 667.6, subdivision (c). Upon remand and resentencing, if the trial court selects that sentence choice, it must express, on the record, an awareness of its sentence choice and the reason for its selection. (*People* v. *Belmontes* (1983) 34 Cal.3d 335, 346 [193 Cal.Rptr. 882, 667 P.2d 686].)

We also deem it inappropriate to address appellant Mortis's contention concerning the sentence on count XI, section 487h, because our Supreme Court has the matter under review. (See, e.g., *In re Pedro T.* (1993) 14 Cal.App.4th 453 [17 Cal.Rptr.2d 564], review granted July 2, 1993 (S032514); *People* v. *Vaughn* (1993) 15 Cal.App.4th 1124 [19 Cal.Rptr.2d 152], review granted July 2, 1993 (S033325).)

### DISPOSITION

The judgments of conviction are affirmed. The sentences are vacated. The matter is remanded to the trial court for further proceedings consistent with the views here expressed.

Lillie, P. J., and Johnson, J., concurred.

The petitions of respondent and appellants for review by the Supreme Court were denied February 24, 1994.

---

[10]*Marsh* cites *Garcia* but only for the proposition that a trial court *may* obtain an evaluation report even for an "ineligible" minor. (*People* v. *Marsh, supra,* at p. 141.)