Filed 7/25/25  P. v. Flowers CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. BRYSON WESLEY FLOWERS, Defendant and Appellant. | F087374 (Super. Ct. No. F23904746) OPINION |

### THE COURT*

APPEAL from a judgment of the Superior Court of Fresno County.  Michael G. Idiart, Judge.

Bryson Wesley Flowers, in pro. per.; and Martin Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Hill, P. J., Franson, J. and De Santos, J.

## INTRODUCTION

A jury convicted defendant Bryson Wesley Flowers of attempted murder and other charges relating to his shooting of P.L. on a Fresno street.  Counsel for defendant submitted a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436, summarizing the facts with citations to the record, raising no issues, and asking this court to conduct an independent review of the record on appeal.  We offered defendant the opportunity to present his own letter brief.  Defendant submitted a response raising two issues relating to the trial court's questioning of witnesses and permitting use of transcripts to assist the jury when listening to recordings admitted as evidence.  Following our complete review of the record on appeal and the separate issues raised by defendant, we order the trial court to amend the sentencing minute order and abstract of judgment and affirm the judgment as amended.

## PROCEDURAL BACKGROUND

The District Attorney of Fresno County filed a first amended information on August 31, 2023, charging defendant with attempted murder (Pen. Code, §§ 664, 187, subd. (a);[1] count 1); assault with a semiautomatic firearm (§ 245, subd. (b); count 2); possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3); and possession of ammunition by a felon (§ 30305, subd. (a)(1); count 4).  The first amended information also alleged defendant personally and intentionally discharged a firearm resulting in great bodily injury (§ 12022.53, subd. (d)) as to count 1; personally inflicted great bodily injury (§ 12022.7, subd. (a)) and personally used a firearm (§ 12022.5, subd. (a)) as to count 2; had one prior strike conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12); had one prior serious felony conviction (§ 667, subd. (a)(1)); and had served two prior prison terms under section 1170, subdivision (h) (Cal. Rules of Court, rule 4.421(b)(3)).  Defendant pleaded not guilty and denied all allegations.

---

[1]     Undesignated statutory references are to the Penal Code.

2.

Defendant requested a *Marsden*[2] hearing on August 3, 2023, and the court denied his motion for new counsel after conducting a hearing.[3]

The trial court bifurcated the trial on defendant's prior conviction allegations at defendant's request. The jury convicted defendant of all charges and found true all allegations on October 27, 2023. Thereafter, defendant waived his right to a jury trial on the prior conviction allegations and admitted them.

At sentencing, the trial court stated that it had considered whether to "stay or dismiss any enhancements" pursuant to section 1385 but would not do so because of "overwhelming evidence of danger to the public safety." The court sentenced defendant to a 14-year prison term for attempted murder (the middle term of seven years, doubled pursuant to section 667, subd. (e)), plus 25 years to life (§ 12022.53, subd. (d)), but stayed and did not impose the five-year prior serious felony conviction enhancement (§ 667, subd. (a)(1)), for a total term of 39 years to life in prison. The court further imposed a stayed term of 25 years for assault with a semiautomatic firearm, a stayed term of four years for possession of a firearm by a felon, and a concurrent four-year term for possession of ammunition by a felon. The court also ordered defendant to pay $2,500 restitution and suspended parole revocation restitution fines (§§ 1202.4, 1202.45) and victim restitution (§ 1202.4, subd. (f)). The court suspended imposition of the court operations and criminal conviction assessments.

## FACTS

On May 27, 2023, at approximately 6:15 a.m., Officer Tyler Bates was dispatched to respond to reports that shots had been fired. Upon arrival, Officer Bates cut off P.L.'s

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

[3] The court also denied defendant's second motion for a *Marsden* hearing after a closed hearing, just before sentencing.

clothing and observed a single gunshot wound to his chest. Officer Serros[4] applied pressure to the wound.[5] P.L. told Officer Bates that "Bryce" shot him, a black male adult, approximately six feet tall, riding a bicycle eastbound. P.L. initially was not able to provide details because he was moaning and in pain, but he eventually provided a brief statement of the pertinent information.

Officer Bates authenticated a recording from his body camera that was admitted into evidence. Transcripts of the audio were disseminated to the jury without objection by defense counsel. The court instructed the jury that the actual evidence was the recording, the transcript was not evidence but could be used as a tool to assist in viewing the video, and the transcript would not be provided to them during deliberations because it was not the evidence.

In the body camera recording, P.L. initially said that he did not know who shot him. He later responded, "A [b]lack dude named Bryce," who was wearing a "hoodie," a couple of inches taller than P.L., athletic, had short hair, and was riding a bicycle. P.L. had met Bryce a few times and would be able to recognize him.

The court referred Officer Bates to page 1 of the transcript of the body camera recording where P.L. responded that he did not know who shot him when asked by another officer. Officer Bates testified that he heard P.L. say that he did not know who shot him. The court then asked whether Officer Bates heard P.L.'s response when the other officer asked, "You didn't see?" as the transcript indicated that the response was

---

**4**      Officer Serros's full name was not included in the appellate record.

**5**      P.L.'s surgeon testified that P.L. had two holes in the right side of his chest, one just under the clavicle to the right of the sternum in the front and another near the spine in the back that were the classic presentation of a gunshot wound. He was in hemorrhagic shock and hypotensive when he arrived at the hospital and lost six liters of blood while in the operating room. P.L. had a large volume of blood collecting in his chest and required blood transfusions and surgery, including to an area of his lung and upper pulmonary artery. His condition was life-threatening.

inaudible. P.L. agreed that P.L.'s answer is not audible on the recording, and he did not hear P.L. provide an answer. The court then referred Officer Bates to page 2 of the transcript where P.L. said, "A black dude named Bryce," and the court asked whether an officer had asked a question that elicited the statement, but Officer Bates did not recall. The court asked whether P.L. was coherent when he made the statements concerning Bryce, including that Bryce was wearing a hoodie, and Officer Bates indicated that P.L. was coherent though in pain. P.L. did not appear to be under the influence, although Officer Bates did not evaluate P.L. for drug use or ask him if he had used drugs. The court asked whether Officer Bates knew if P.L. was tested for drugs at the hospital, but Officer Bates did not know.

Officer Bates explained that semiautomatic handguns extract the casing after each shot, which land on the ground. If the shooter is in one spot while firing, casings pool in the same general area. Two casings were found just right of P.L. and approximately five to seven yards apart. The court asked questions to clarify that the difference between a revolver and a semiautomatic firearm is that a revolver retains its casings inside the cylinder while a semiautomatic firearm "flips out" the casings.

Officers recovered surveillance recordings from the area of the shooting, eventually causing Officer Andres Rodriguez to locate footage from a private residence that showed an individual on a bicycle passing the residence at approximately 6:11 a.m. Officer Jim Pedraza responded to the shooting and later canvassed for video surveillance from nearby residences. He located a video recording from a residence two or three houses east of where P.L. was found. The video shows P.L.'s head bobbing behind a fence while two bicycles approach his location. One of the individuals circled his bicycle in the middle of the road twice while appearing to talk to P.L., then jumped from his bicycle and walked toward P.L. with his hand extended as if holding a firearm, and then left on the bicycle. The second individual, wearing red clothing, turned his head and observed what happened as he rode off in a different direction.

Detective Dominic Morini spoke with P.L. approximately five days after the shooting when he was well enough to converse. P.L. was cooperative and eager to see the detective catch the individual who shot him. P.L. said that an individual named "Bryce" had shot him. Detective Morini recorded his conversation with P.L., and the prosecutor played it to the jury. P.L. advised that Bryce, a black man, rode by P.L. on a bicycle and asked him how long he had been working for the cops. P.L. denied it, and Bryce circled back and shot him. P.L. did not know why Bryce shot him.

Detective Morini had viewed a video that showed a black man on a bicycle circle past P.L. two times, exchange words, and then lunge off the bicycle with a gun in his hand and shoot P.L. Detective Morini identified defendant as the suspect and prepared a photographic lineup, which he provided to another detective who reviewed it with P.L. Detective Morini then obtained a warrant for defendant because P.L. selected defendant from the photographic lineup.

Detective Adam Estrada conducted the photographic lineup and exhibited six photographs to P.L. P.L. immediately identified defendant's photograph as the individual who shot him. The conversation with P.L. was recorded and introduced into evidence. Detective Estrada read P.L. an advisement that the person who committed the crime may or may not be included in the photographs and asked P.L. to tell him whether or not the person who committed the crime was one of the individuals in the photographs. P.L. identified, "This guy right here" (a photograph of defendant) and stated, "He shot me in the chest," and was "definitely that guy."

Officer Justin Phoolka testified that, while on patrol on June 25, 2023, he observed defendant riding a bicycle and was aware of the warrant for his arrest. Officer Phoolka's partner ordered defendant to stop, but defendant failed to comply and rode off. After a short chase, the officers took defendant into custody.

P.L. testified that he was homeless and did not want to testify, he was not a friend to justice. He was "probably not going to say much" and had to comply "because [he

6.

was] on parole" for burglary and dissuading a witness. P.L. had been using drugs and was picking up more drugs to sell so that he could obtain more drugs to keep himself high. He had first helped a friend to steal electricity by "wiring up" his garage and was walking from that home to obtain additional amounts of drugs. He "was confronted by a couple of dudes" on bicycles and "got shot." When asked if he recognized one of the individuals on a bicycle in court, P.L. testified, "Man, I told you guys then, but, no," and he did not see him in court. Prior to the shooting, one of the men accused him of working with the police or being an informant. One man rode away and the second man circled back on his bicycle and shot P.L.[6]

P.L. testified that he did not know the name of the individual who shot him and, when questioned by police, was high on hospital drugs. He believed the officer was asking a question regarding his girlfriend that had nothing to do with the shooting. While P.L. might have mentioned defendant's first name, he did not do so in relation to defendant being the shooter. P.L. did not remember speaking with the police in the street after he was shot because he "was pretty much dead." After being shown a video and a transcript of his conversation with police, P.L. still could not recall his statements. The court asked P.L., "[W]hat I want to know, at this point, is whether that refreshes your memory as to what you said." P.L. responded, "Not at all."

When asked about his statements to Detective Morini while at the hospital, P.L. similarly testified that he did not remember any of his statements. P.L. testified that he was in the hospital 45 days and would not have spoken to the detective a couple of days after the incident because he was nonresponsive for 10 days.[7] As the prosecutor asked

---

[6]     The court asked P.L. to clarify whether one person shot him or two because defense counsel used the term "they."

[7]     When, the prosecutor attempted to clarify P.L.'s answer as to whether he was in the hospital 45 days or 4 or 5 days, the court stated, "He said he was at the hospital 45 days. He said he was nonresponsive for 4 or 5 days." P.L. stated that he was nonresponsive for 10 days, and the court replied, "So now you're saying 10 days; is that

7.

about defendant's statements to Detective Morini while in the hospital, the court asked clarifying questions directed at ascertaining whether P.L. remembered his answers.[8] P.L. did not remember telling Detective Morini that Bryce was the individual involved in the shooting.[9]

P.L. testified that he knew Bryce from prior interactions when Bryce would "hang out" with P.L.'s girlfriend. When the prosecutor asked P.L. how long he had known Bryce, the court asked P.L. to estimate how long before the shooting. P.L. showed the jury his scars, and the court asked several questions to clarify which scar resulted from the shooting. P.L. testified he did identify defendant in a photographic lineup, but he was coerced to do so and his faculties were not working. P.L. did not recall telling Detective Estrada that Bryce shot him in the chest or that he recognized Bryce's facial features, but Bryce was the only person he recognized and he was mentally incapacitated at the time. P.L. could not testify with any level of certainty that defendant was the individual who shot him.

---

right?" P.L. added, "Maybe I did say '4 or 5.' I don't know." The court stated, "The record will tell us what you said both times."

[8] For example, the prosecutor asked P.L. whether he remembered the officers discussing "Bryce" and a park and then responding, "But that's not where he shot me." P.L. testified, "I wasn't shot at [the] Park." The court instructed, "Sir, what I want you to listen to is the actual question," "because sometimes you're answering something else." After asking P.L. whether he remembered making the statement, P.L. responded that he did not recall making the statement. After P.L. completed his testimony, the court advised the prosecutor that it would be an "uphill battle" admitting P.L.'s prior statements.

[9] The court asked additional clarifying questions during P.L.'s testimony when he gestured to indicate the closeness of the shooter and when he gestured to his forehead when discussing a hat worn by the shooter.

## DISCUSSION

**I.**  ***The trial court did not interfere with defendant's right to effective assistance of counsel or to cross-examine witnesses by asking questions of the witnesses.***

A trial judge has a duty to control trial proceedings so that the evidence is fully developed, ambiguities and conflicts are resolved insofar as far as possible, and the truth may be effectively ascertained.  (*People v. Carlucci* (1979) 23 Cal.3d 249, 255; see § 1044.)  In the discharge of this duty, a trial judge may, among other things, examine witnesses to elicit or clarify testimony.  (*People v. Rigney* (1961) 55 Cal.2d 236, 241; Evid. Code, § 775.)  "The examination should be 'conducted impartially, so that the jury will not receive improper inferences as to the judge's opinions on the case.' "  (*People v. Camacho* (1993) 19 Cal.App.4th 1737, 1744.)

However, to obtain appellate review of claimed prejudicial "cross-examination" by the trial court, defendant must have timely and specifically objected to that examination.  (Evid. Code, § 353; *People v. Corrigan* (1957) 48 Cal.2d 551, 556, 559.)  Defendant did not object to the trial court's questioning of the witnesses.

Even if defendant had not forfeited the objection, we cannot conclude that the trial court's questions were adversarial or designed to undercut defendant's defense.  The trial court only asked nonargumentative questions and did not disparage or discredit defendant or ally itself to the prosecution.  Additionally, at the commencement of the trial, the court instructed the jury not to "take anything I say or do during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be."  The court repeated this instruction before the jury began deliberating.

Therefore, we find no abuse of discretion or prejudice in the trial court's questioning of the witnesses.  (See *People v. Camacho, supra*, 19 Cal.App.4th at pp. 1746–1747; *People v. Sturm* (2006) 37 Cal.4th 1218, 1233, 1237–1238; *People v. Sanders* (1995) 11 Cal.4th 475, 531–532.)

9.

***II. The trial court did not commit judicial misconduct or violate defendant's right to due process by allowing the jury to use an unauthenticated transcript in reviewing audio evidence.***

Defendant also argues that the trial court erred by failing to ensure the accuracy of transcripts used by the jury when viewing audio and video evidence. We review claims regarding a trial court's evidentiary rulings for an abuse of discretion and "will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

In determining a transcript's accuracy and reliability, the better practice is for the court to inquire who prepared it and how it was prepared and compare the transcript with the recording. (*People v. Brown* (1990) 225 Cal.App.3d 585, 597.) However, the failure to do so here was not error. In this case, the transcripts were not admitted as evidence. The jury was instructed prior to each recording that the transcript was not evidence, was to be used only as a guide, and that the recording itself was the evidence. (See *id.* at pp. 597–598.) We presume the jurors followed the court's instructions regarding the recordings and the use of the transcripts. (*People v. Scott* (1988) 200 Cal.App.3d 1090, 1095.)

Defendant argues the transcript provides that P.L. told officers that the suspect was a black male wearing a hoodie, but the recording shows that P.L. stated he did not know what the individual was wearing. However, Officer Bates's responses to the court's questions (as set forth above) sufficiently establish the accuracy of the transcript as to these statements. "Transcripts of admissible tape recordings are only prejudicial if it is shown they are so inaccurate that the jury might be misled into convicting an innocent man." (*People v. Brown, supra*, 225 Cal.App.3d at p. 599, citing *People v. Fujita* (1974) 43 Cal.App.3d 454, 472–473.) Officer Bates and Detectives Estrada and Morini all testified as to P.L.'s statements identifying defendant as the individual who shot him and corroborate the accuracy of the transcripts on this issue. In light of the cautionary

instructions read the jury and the witness testimony as to P.L.'s actual statements, defendant has failed to show that the transcript was so inaccurate as to mislead the jury. (See *Brown*, at p. 599.)

Therefore, no error is shown, and the trial court did not abuse its discretion in allowing the jurors to use the transcripts as guides while listening to the recordings.

## III. *The trial court erroneously stayed the section 667, subdivision (a)(1) enhancement.*

We note that the trial court stayed the section 667, subdivision (a)(1) enhancement at resentencing. However, section 1385, subdivision (a) states in part: "The judge or magistrate may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." Section 1385, subdivision (b)(1) provides that if a court "has the authority pursuant to [section 1385,] subdivision (a) to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice .…" And "Senate Bill [No.] 1393 [(2017–2018 Reg. Sess.)] removed provisions that prohibited a trial court from striking a serious felony enhancement in furtherance of justice under section 1385." (*People v. Stamps* (2020) 9 Cal.5th 685, 700.)

The plain language of section 1385 only permits the trial court to strike or dismiss, rather than stay, the enhancement or its punishment pursuant to section 667, subdivision (a)(1). (See *People v. Lopez* (2004) 119 Cal.App.4th 355, 364 ["Ordinarily, an enhancement must be either imposed or stricken 'in furtherance of justice' under … section 1385. [Citations.] The trial court has no authority to stay an enhancement, rather than strike it—not, at least, when the only basis for doing either is its own discretionary sense of justice."]; *People v. Haykel* (2002) 96 Cal.App.4th 146, 151 [" 'Unless a statute says otherwise, an enhancement may be *imposed* or *stricken*, but … may not be *stayed*; to do so is an illegal sentence.' "].)

11.

Section 1260 provides that we may modify the judgment and remand the cause to the trial court "for such further proceedings as may be just under the circumstances." The record is clear that the trial court did not intend to dismiss the enhancement when it stated, "[T]he five-year violent prior, I'm going to stay that and not impose it." As the record is clear that the court did not intend to punish defendant for the section 667, subdivision (a)(1) enhancement, we cannot conclude a resentencing hearing is required and, therefore, it is "just under the circumstances" (§ 1260) to direct the trial court to prepare an amended sentencing minute order and abstract of judgment to reflect that punishment for the section 667, subdivision (a)(1) five-year enhancement was stricken rather than stayed.

## DISPOSITION

The judgment is modified to strike, rather than stay, the punishment imposed pursuant to section 667, subdivision (a)(1). The trial court is directed to amend the December 18, 2023 sentencing minute order and abstract of judgment accordingly, and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.

The judgment is affirmed as modified.