Filed 6/9/16  P. v. Hernandez CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER HERNANDEZ,<br><br>        Defendant and Appellant. | A140625<br><br>(Solano County Super. Ct. No. FCR276952) |

Defendant and appellant Christopher Hernandez (appellant) pled not guilty and not guilty by reason of insanity to a charge of murder.  A jury convicted him of first degree murder and, following a separate sanity trial, found he was sane at the time of the murder. Among other things, appellant contends the sanity finding is not supported by substantial evidence, the trial court prejudicially erred in its questioning of appellant's sanity-phase experts, and the court's instruction on the legal definition of sanity was flawed.  We reject those and appellant's other contentions and affirm.

PROCEDURAL BACKGROUND

In April 2011, the District Attorney of Solano County filed an information charging appellant with murder (Pen. Code § 187, subd. (a))[1] and alleged an enhancement for use of a knife (§ 12022, subd. (b)(1)) and two prior strikes (§ 667, subds. (b)–(i)). Appellant pled not guilty and not guilty by reason of insanity.

---

[1] All undesignated statutory references are to the Penal Code.

In June 2013, a jury found appellant guilty of murder in the first degree and found true the weapon enhancement. The trial court found the prior strike allegations true. Subsequently, the jury found appellant was sane during commission of the murder.

In November 2013, the trial court denied appellant's motion for a new sanity trial and sentenced appellant to a prison term of 76 years to life, consisting of a 25-year-to-life term tripled due to the two strikes, plus one year for the weapon enhancement. This appeal followed.

## FACTUAL BACKGROUND[2]

In June 2010, appellant and his mother lived in a trailer park in Fairfield. The victim, Karen Harrison, lived a few trailers away. Appellant and Harrison were friends; appellant and another neighbor, Ken White, were helping Harrison remodel her trailer.

In May 2010, following an incident with appellant, Harrison started sleeping at her mother's home instead of in her trailer. Harrison told White's mother, Lois Olson, that appellant had overpowered her and tried to take her pants off.[3] Harrison said she had spoken with appellant afterwards and he had promised to "be a gentleman." White's sister, Gay Clark, also heard about the incident and warned Harrison to be careful around appellant, but Harrison said she only worried if appellant drank.

White died of liver disease on June 4, 2010. On June 5, Clark went to Harrison's trailer and through an open door she heard Harrison say, "Don't you ever do that again. And I mean it. You need to be a gentleman." Appellant was in the trailer with Harrison; there was also a man from the cable company there. On June 7, Clark warned Harrison again that she should be careful; Harrison responded, "I know Chris won't hurt me." Olson also warned Harrison to be careful around appellant; Harrison said, "I will not have sex with Chris. The only way he's going to get sex with me is he's gonna have to kill me."

---

[2] Because the issues on appeal all relate to appellant's sanity plea, this factual summary omits many details not important to this court's analysis. The sanity-phase expert testimony is summarized in the discussion of appellant's claims.

[3] Harrison's statement was admitted for the limited purpose of showing her "state of mind at the time of her death."

On June 14, 2010, just before 5 a.m., appellant knocked on the door of his mother's home. When his 13-year-old niece, Arselia, opened the door, appellant said, "I fucked up" and "I killed Karen." A friend of Arselia's was sleeping over, and appellant said "Oh, great. Another witness" or "Oh man. We have a witness." Appellant told Arselia that he and Harrison had been drinking, and Harrison "got naked" and asked him to kill her. Appellant was holding a shirt containing a bloody kitchen knife. He told Arselia he was going to prison, and asked her to visit him there.

Appellant told his mother Harrison asked him to kill her. He said Harrison told him she did not want to live anymore because White had died. Appellant's mother called 911 at 5:53 a.m.[4] Appellant admitted on the 911 call that he killed Harrison; he said Harrison told him, "Take me out. I'm really tired of this stuff." He said he was "guilty" and asked the 911 operator to send police to arrest him. Police arrived and arrested appellant.

Appellant's Police Interviews

In a police interview the day of the killing, appellant said he and Harrison made a pact in which he would kill her, and then kill himself. He and Harrison were drinking, and Harrison took off her clothes and began "parading around . . . naked." They kissed, but she was depressed. She was upset about White's death, stressed about various things, and taking a lot of pills. She said she "couldn't deal with life anymore" and asked appellant to kill her. Harrison laid down and asked appellant to choke her. He tried but was unable to do so, and Harrison asked him to stab her with a knife. He stabbed her once. He had planned to stab himself next, but he was scared and could not do it. Appellant told the police he was "gonna pay for it because I'm the one that did it," and he asked whether "they still do the . . . gas chamber." He claimed he had been in a romantic relationship with Harrison, and they had sexual contact the night he killed her. He denied raping her.

---

[4] Appellant's mother claimed she called 911 after talking to him for about six minutes.

3

The police interviewed appellant a second time the next day, June 15, 2010. Appellant acknowledged an "incident" about a month before when he "went too rough on" Harrison. With respect to the killing, he explained Harrison said she did not want to live anymore because she was always taking pills, her ex-husband's family thought she was "walking trash," her mom wanted her to move out, and her ex-husband did not provide adequate child support. After appellant failed to choke Harrison, she told him to use a knife. Appellant said he told her, "But I'll get in trouble." She suggested he kill himself as well, and he agreed. After appellant killed Harrison, he spent time in her apartment trying to build up the courage to kill himself, but he could not do it. Appellant accounted for bruises on Harrison's body by claiming she had fallen repeatedly on the floor while drunk. He said Harrison had scraped his penis while orally copulating him.

The Physical Evidence

The physical evidence showed no indication of strangling. The stab wound indicated the knife entered Harrison's chest and was moved up and down while inside her body; there was only one entry wound, but there were 11 wounds on her back. Harrison had abrasions on her face, bruises on her arms, and faint contusions on her back. There was dark-colored material on Harrison's thighs, legs, buttocks, and vagina; some of it appeared to be blood and some of it appeared to be fecal matter. Appellant had three abrasions on his penis, a cut on his hand, a bite mark on his chest, and abrasions on his knees.

Defense Witnesses

A friend and former boyfriend of Harrison testified he gave her Vicodin pills once or twice, although he told a police officer he gave her pills two times a week. The friend also testified he received a text from her on June 13, 2010 referring to a "crazy" party at her house with "dope flowing." The prosecutor elicited that Harrison said she was fearful of appellant, whom she said was "stalker status." She said appellant once tried to pull off her pants, and she was not romantically interested in him.

A neighbor testified she saw appellant and Harrison together twice in February 2010. She observed appellant being physically affectionate towards Harrison. The

4

neighbor testified Harrison was not responding to appellant's affections, although she admitted that Harrison had her hand on top of appellant's hand.

Harrison's ex-husband testified she had mental problems, including attention-seeking behavior. She was like a roller coaster, always either very high or very low. Once in 1999 he came home and found her passed out with superficial cuts on her forearm, above the wrist. Sometimes when they argued Harrison would say she wished she were dead.

## DISCUSSION

I.   *Substantial Evidence Supports the Jury's Sanity Finding*

Appellant contends the jury's finding he was sane when he killed Harrison must be reversed because the evidence of insanity—essentially the testimony of the two expert witnesses during the sanity phase of trial— was of such weight that a jury could not reasonably reject it. We reject the contention.

A.   *Legal Background*

"Under California's statutory scheme, '[p]ersons who are mentally incapacitated' are deemed unable to commit a crime as a matter of law.[5]  [Citation.]  Mental incapacity . . . is determined by the *M'Naghten* test for legal insanity provided in section 25, subdivision (b).  (*M'Naghten's Case* (1843) 8 Eng.Rep. 718, 722; [additional citations].)  Under *M'Naghten*, insanity is established if the defendant was unable either to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed." (*People v. Elmore* (2014) 59 Cal.4th 121, 140 (*Elmore*).)[6]

---

[5] While acknowledging the issue is undecided, appellant contends the United States Constitution requires states to recognize an insanity defense. (See *Clark v. Arizona* (2006) 548 U.S. 735, 752, fn. 20.)  We need not and do not address that issue in the present case.

[6] Section 25, subdivision (b) provides, "In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." In *People v. Skinner* (1985) 39 Cal.3d 765, 775–777, the Supreme Court held that, despite the

"Notably, a defendant may suffer from a diagnosable mental illness without being legally insane under the *M'Naghten* standard." (*People v. Mills* (2012) 55 Cal.4th 663, 672 (*Mills*).)

When, as in this case, the defendant pleads both not guilty and not guilty by reason of insanity, "[t]he trial is bifurcated, with the question of guilt tried first . . . . [I]n order to reserve the issue of sanity for the second phase of trial[,] the defendant is . . . conclusively presumed to have been legally sane at the time of the offense. [Citations.] Evidence of the defendant's mental state may not be admitted at the guilt phase to prove insanity. [Citations.] If the defendant is found guilty, the trial proceeds to the sanity phase, where the defendant bears the burden of proof by a preponderance of the evidence. [Citations.] 'The separation of the two stages of the bifurcated trial is solely for the purpose of keeping the issues of guilt and sanity distinct; for other purposes, the trial is regarded as single and continuing.' " (*Elmore*, *supra*, 59 Cal.4th at pp. 140-141; see also § 1026, subd (a); *Mills*, *supra*, 55 Cal.4th at p. 672.)

On appeal, we review the jury's determination for substantial evidence. (*People v. Chavez* (2008) 160 Cal.App.4th 882, 891.) We view the evidence in the light most favorable to the verdict and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) In determining the issue of sanity, it is the role of the jury to evaluate the expert opinions and the bases therefor. (*Chavez*, at p. 891; see also *People v. Mercer* (1999) 70 Cal.App.4th 463, 466–467 [the "credibility of the experts and their conclusions" are matters for determination by the jury].) Ultimately, "[b]ecause the burden was on the defense to show by a preponderance of the evidence that appellant was insane, before we can overturn the [jury's] finding to the contrary, we must find as a matter of law that the [jury] could not reasonably reject the evidence of insanity." (*People v. Skinner* (1986) 185 Cal.App.3d 1050, 1059; see also *People v. Drew* (1978) 22

---

statutory use of "and," the intent in enacting the statute was to reinstate the *M'Naghten* test in which insanity can be shown under *either* the "nature and quality" prong *or* the "right from wrong" prong of the test.

Cal.3d 333, 351, superseded by statute on another ground as stated in *People v. Skinner*, *supra*, 39 Cal.3d at p. 769 ["the question on appeal is" whether the evidence of insanity was "of such weight and character that the jury could not reasonably reject it"].)[7] Stated differently, the question for this court is whether "there is any reasonable hypothesis upon which the [jury] could have found [appellant] legally sane during the commission of the crime." (*People v. Belcher* (1969) 269 Cal.App.2d 215, 220; accord *People v. Severance* (2006) 138 Cal.App.4th 305, 319.)

      B.    *Factual Background*

During the sanity phase of trial, appellant presented testimony from two expert witnesses, as described hereafter.

      1.    *Dr. Robert Wagner*

Dr. Robert Wagner was appointed by the court to evaluate appellant. He has a Ph.D. in clinical psychology. About half his practice involves mental evaluations; he has been doing such work for over 20 years. Wagner's primary sources of information were a 90-minute interview with appellant, medical records from the county jail, and a 42-minute conversation with appellant's mother.

Appellant's mother told Wagner she felt there was something wrong with appellant from when he was an infant. He did not have many friends and was in special education classes for 10 years. Appellant's father probably suffered from depression. Appellant's sister has been diagnosed with schizophrenia and is under the protection of a conservator. Schizophrenia has a genetic origin.

Appellant told Wagner he began to hear voices at about the age of 14. He did not tell anyone, which is not unusual. Appellant began drinking alcohol at around the same

---

[7] In *Drew*, the California Supreme Court abandoned the *M'Naghten* test and adopted the test for mental incapacity proposed by the American Law Institute. (*Drew*, *supra*, 22 Cal.3d at p. 345; see also *Skinner*, *supra*, 39 Cal.3d at p. 768.) Nevertheless, *Drew* considered whether there was substantial evidence to support the jury's finding under the *M'Naghten* test because, if not, the defendant could have avoided a retrial. (*Drew*, at pp. 349–350.) Subsequently, the California electorate adopted an initiative measure that reinstated the *M'Naghten* test. (*Skinner*, at pp. 768–769.)

time he began having auditory hallucinations; people who hear voices often use alcohol to self-medicate. Appellant described a prior occasion when he contemplated suicide because a voice he referred to as "Dodger" commanded him to kill himself.

Wagner concluded that Hernandez suffers from a "severe mental defect" called "schizoaffective disorder." Schizoaffective disorder is a combination of schizophrenia with an emotional disorder, in this case depression. Wagner gave appellant a 35 on a global assessment of functioning scale, which is "very low." Wagner acknowledged appellant was working around the time of the killing, but Wagner explained that many jobs do not require a high level of functioning.

Wagner always looks for malingering when doing mental evaluations. He did not believe appellant was malingering because the level of impairment appellant described was consistent with Wagner's diagnosis; Wagner was able to confirm his diagnosis with information provided by appellant's mother and from medical records; and appellant's apparent low IQ suggested it would be difficult for him to fabricate mental illness.

Appellant was unemotional when he described the killing. Appellant said Harrison asked him to kill her, and he heard a voice he referred to as "Dodger" telling him to kill her. At the time, appellant thought it was "the right thing to do," but after Harrison died he realized "almost right away that he had done something wrong." Appellant said he knows it was wrong to kill Harrison, and he feels sad about it. He also told Wagner that Harrison has visited him in custody, that she looks happy, that they're still friends, and that she is waiting for him to join her.

Wagner opined that at the time of the offense appellant was not able to understand the nature and quality of his act and was unable to distinguish right from wrong. On cross-examination, Wagner acknowledged he had not seen appellant's police interviews or heard the 911 call. When questioned about various statements appellant made in the course of his police interviews, Wagner acknowledged the statements showed appellant knew what he did was wrong at the time of the interviews. When questioned about appellant's statement that he told Harrison he would get in trouble if he killed her, Wagner said the comment was "taking place in the context of what I think is a delusional

8

situation between the two of them." Wagner said it might affect his analysis if appellant had tried to sexually assault Harrison in the past or if Harrison denied any interest in a romantic relationship with appellant.

On questioning by the court, Wagner testified his opinion was premised on a belief appellant was telling the truth when he said Harrison asked him to kill her. His opinion probably would be different if he did not believe appellant on that point.

### 2.    *Dr. Randall Solomon*

Dr. Randall Solomon is a medical doctor who practices forensic psychiatry. Solomon evaluated appellant at defense counsel's request. He interviewed appellant for six hours over three separate occasions. He also relied on police reports, interview reports, video-recordings of the police interviews, Dr. Wagner's report and the report of another court-appointed psychiatrist,[8] appellant's school and jail records, and a meeting with appellant's mother.

In his testimony, Solomon related various details about appellant's childhood and schooling. Appellant told him that he started hearing voices when he was in seventh grade. He avoided interaction with others, used drugs to quiet the voices, and rocked back and forth to soothe himself. Appellant dropped out of school in tenth grade; he was not sure if people were making fun of him, but the voices were telling him they were. There were multiple voices that appellant heard: two were of the same person, whom he called "Dodger"; another "voice" was just a presence that did not speak; and at the time of the interview he also heard Harrison's voice in his head.

At age 18, appellant had suicidal thoughts because the voices told him to kill himself. About two months before he killed Harrison, the voices told appellant to go to a cemetery with a knife and kill himself; he was not able to do it. Some months before the killing, the voices began to tell him that he would have to kill Harrison, but he did not know why.

---

[8] Dr. Murray Eiland was another doctor appointed by the court. He also concluded appellant was insane at the time of the offense, but did not testify at trial.

Appellant told Solomon that he and Harrison were drinking on the day of the killing. Harrison told Hernandez to kill her; at one point she taunted him, saying "bitch, you can't do it." He wasn't able to choke her, so he obtained a knife. Appellant and Harrison struggled with the knife. The voices were very loud, and kept saying "stab, stab, stab." Appellant stabbed Harrison; the knife got stuck, so he had to work to get it out. The voices told him he had to kill himself, but he was unable to do it.

Appellant did not show much emotion during the interviews with Solomon. Solomon explained that the inability to relate emotionally is a classic symptom of schizophrenia. Appellant also exhibited an inability to grasp abstract concepts and a looseness of association, meaning that when he spoke he would change topics and it would be difficult to figure out the connection. Solomon diagnosed appellant with schizophrenia, alcohol dependency, and marijuana and methamphetamine abuse. Within the range of schizophrenics, appellant is fairly high functioning. Solomon saw "no evidence" that appellant was malingering; he exhibited the signs and symptoms of schizophrenia, and appellant's background and life story were consistent with that diagnosis. Solomon was "very confident" in his diagnosis.

Solomon opined that appellant was unable to differentiate right from wrong at the time of the killing. Appellant knew he was killing Harrison, but he did not understand the distinction between a "release" and a death. What appellant said after the crime would be relevant only if his statements referred to his mental state at the time of the crime. Solomon opined that appellant realized it was wrong immediately after he killed Harrison. Solomon explained, "once the act was committed, he had a reality in front of him and now he wasn't dealing with a picture of something influenced by voices, ambivalent thoughts, everything that was going on, he had a dead body, and he was able to recognize that he had a dead body, and then he knew what happened."

On questioning by the court, Solomon testified that, even if the events appellant described in his police interview did not occur, Solomon would still believe appellant was insane at the time of the crime, because Solomon was "pretty firm in [his] conviction that this is how [appellant] understands it."

10

C.      *Analysis*

Appellant contends the evidence of his insanity was of such weight and character that the jury could not reasonably reject it.  In particular, two expert witnesses testified appellant was insane, and the prosecution presented no expert testimony to the contrary.

Appellant first emphasizes that the overwhelming weight of the evidence was that appellant has schizophrenia.  We need not consider whether the evidence obligated the jury to agree because, assuming appellant is a schizophrenic, that does not mean he was legally insane at the time he killed Harrison.  (*Mills*, *supra*, 55 Cal.4th at p. 672 ["a defendant may suffer from a diagnosable mental illness without being legally insane"].)  The ultimate issue is whether, due to his mental illness, appellant was unable to understand the nature of his action or to distinguish right from wrong when he killed Harrison.  (*Elmore*, *supra*, 59 Cal.4th at 140.)  Appellant concedes there is sufficient evidence that he understood the nature of his act, so the real determinative issue is whether he was able to appreciate the wrongfulness of the act.  (See *People v. Blakely* (2014) 230 Cal.App.4th 771, 779 ["While we acknowledge [defendant] presented evidence that he suffered from paranoid schizophrenia, he did not present sufficient evidence for the jury to reasonably conclude he was incapable of distinguishing the moral rightness or wrongness of his actions when he attacked and robbed [the victim]."].)

There was little direct evidence of appellant's state of mind at the time of the killing.  Appellant's experts concluded appellant was unable to distinguish right from wrong based essentially on appellant's diagnosis as a schizophrenic and an assumption that appellant was telling the truth about what happened or believed he was telling the truth.  The one piece of evidence that is directly reflective of appellant's state of mind is his statement to the police that he told Harrison he would get in trouble if he killed her.  Appellant argues that statement "suggested, at most, the knowledge that killing Harrison was legally wrong; it did not suggest an understanding that it was morally wrong."  We agree the statement is not an unambiguous admission that appellant knew killing Harrison was morally wrong.  It can be construed narrowly to mean only that appellant knew it was contrary to the law.  (*Skinner*, *supra*, 39 Cal.3d at p. 783 ["a defendant who is

11

incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful"]; see also *People v. Torres* (2005) 127 Cal.App.4th 1391, 1401–1402 (*Torres*).)[9] On the other hand, the jury reasonably could infer that appellant's admission he made that comment to Harrison meant appellant was not incapable of moral reflection at the time of the killing. To find appellant insane in light of that comment required the jury to accept that, despite the fact that appellant was aware of the nature of his act and was able to recognize it was not an action sanctioned by law, his mental illness rendered him entirely unable to assess whether the act was moral. Appellant points to nothing in the expert witnesses' testimony that explained how schizophrenia could produce such a nuanced mental state, or how it might have in the present case.

In any event, even putting appellant's comment to Harrison aside, the jury could have been skeptical appellant killed Harrison under the influence of a schizophrenic delusion due to the absence of corroboration in appellant's statements and behavior following the killing. Appellant never mentioned to the police or the sexual assault examination (SART) nurse that he had been hearing voices the night of the killing, and he did not tell jail officials about hearing voices for six months. Dr. Solomon testified he would not have expected appellant to mention hearing voices to the police, and, to the contrary, he would have been suspicious had appellant done so. However, that testimony did not preclude the jury from making its own assessment of that circumstance. Furthermore, appellant did not display what Solomon described as typical behavior for schizophrenics in the first police interview following the killing, such as disorganized or incoherent speech, rocking, or catatonic behavior. Appellant demonstrated an understanding of what he had done and that it was wrong. He was also calm and

---

[9] In *Skinner*, the People suggested the evidence showed the defendant was aware his killing was unlawful, even though he believed it was commanded by God. (*Skinner*, *supra*, 39 Cal.3d at p. 783.) In *Torres*, the defendant presented evidence he felt morally justified in shooting doctors he believed, as a result of a delusion, were poisoning him and others, even though he was aware his conduct would be considered wrong by society. (*Torres*, *supra*, 127 Cal.App.4th at p. 1402.)

12

cooperative when examined by the SART nurse hours after the murder. Appellant's experts testified they believed appellant regained his sanity after the killing. But that did not preclude the jurors from considering the lack of corroboration in appellant's behavior following the killing in determining whether he was sane at the time of the crime. (See, e.g., *People v. Skinner*, *supra*, 185 Cal.App.3d at p. 1051 [defendant's behavior following killing and statements "exhibiting extreme remorse and a clear understanding of what he had done" supported finding defendant was sane at time of killing].)

Moreover, appellant fails to seriously engage with the possibility that the jury believed appellant was lying about what happened the night of the killing. There is a likelihood the jury believed that appellant sexually assaulted Harrison (or attempted to do so) and that Harrison did *not* ask appellant to kill her. There was evidence from which the jury could infer that appellant had tried to sexually assault Harrison in the past and that she was uninterested in appellant romantically. That evidence was contrary to appellant's claims of a romantic relationship with Harrison. There was physical evidence suggestive of violence (injuries on both appellant and Harrison) and rough sexual contact (the abrasions on appellant's penis), as well as evidence suggesting the killing was accomplished in a particularly violent manner (repeated knife thrusts). Other than appellant's statements, there is no evidence Harrison wanted to end her life at around the time of her killing. If the jury concluded appellant was lying about the events surrounding the killing, the jury reasonably could have inferred the lies were inconsistent with a conclusion appellant was insane at the time of the killing. Instead, the jury reasonably could have concluded appellant killed Harrison in a fit of drunken violent anger after her rejection of a romantic advance and then invented the story about the voices in his head and the suicide pact in order to diminish his culpability. The fact that appellant turned himself in reasonably could be given little weight, since appellant would have been the obvious suspect in any event.[10]

---

[10] It is worth noting that appellant's descriptions of the killing were not entirely consistent. Appellant told the police and the testifying experts that Harrison asked him to kill her. But appellant told the non-testifying appointed doctor Eiland that voices alone

13

The experts were asked what effect it would have on their opinion if appellant was lying. Dr. Wagner admitted it would probably affect his opinion. Dr. Solomon denied it would affect his opinion, explaining that he was not searching for a motive and re-asserting that he believed appellant's story was how appellant understood what occurred. But appellant points to no testimony explaining how a conclusion he was insane is consistent with a scenario in which he killed Harrison in a sexually-related violent attack and then invented a story about a suicide pact. Thus, the expert testimony left a huge analytic gap. Neither does appellant point to any testimony explaining how appellant's schizophrenia might have led appellant to commit a violent murder during a sexual assault. There was no hypothesis offered of how such a killing could occur without appellant understanding its wrongfulness, much less a hypothesis that the jury was obligated to accept. (See *Blakely*, *supra*, 230 Cal.App.4th at p. 779 [trial court properly directed a verdict of sanity where experts failed to explain what defendant "believed or did not believe was morally correct at the time he attacked" the victim].)

Ultimately, appellant's contention fails because "expert testimony, even if uncontradicted, is not binding on the trier of fact, and may be rejected, especially where experts are asked to speculate about a defendant's state of mind at the moment the crime was committed." (*People v. Green* (1984) 163 Cal.App.3d 239, 243; see also *Drew*, *supra*, 22 Cal.3d at p. 350 ["we have frequently upheld on appeal verdicts which find a defendant to be sane in the face of contrary unanimous expert opinion"].)[11] Instead, "[t]he trier of fact may consider the reasons given for expert opinions, and may weigh expert testimony with all of the evidence including the circumstances before, during, and after the offenses." (*Green*, at p. 244.) In the present case, the experts based their opinion about appellant's sanity at the time of the offense almost entirely upon their diagnosis that he was a schizophrenic and their belief that the killing as he described it

told him to kill Harrison, that nothing she did brought about the killing, and that he formed the intent to kill her over a period of weeks or possibly months.

[11] As the Supreme Court pointed out in *Drew*, a defendant's mental state at the moment of a crime "is not a matter which psychiatrists can detect by testing or interview." (*Drew*, *supra*, 22 Cal.3d at p. 351.)

14

was consistent with that diagnosis.  But, assuming the jury accepted the diagnosis, the jury was entitled to consider the totality of the evidence surrounding the crime in deciding whether appellant proved he was legally insane at the time of the killing.

We conclude the evidence at trial did not obligate the jury to conclude that appellant met his "burden of proving, by a preponderance of the evidence, that he was legally insane when he" killed Harrison.  (*Mills*, *supra*, 55 Cal.4th at p. 672.)[12]

II.     *The Trial Court's Questions to Appellant's Experts Were Not Prejudicial Error*

Over objections from appellant, the trial court questioned appellant's experts after the prosecutor had cross-examined them.  Appellant contends the court's questions were adversarial, repetitive of the prosecutor's questions, and misleading.  He argues the questioning "created the impression that the judge was 'allying himself with the prosecution,' violating [appellant's] rights under state law and the state and federal constitutions.  (*People v. Harris* (2005) 37 Cal.4th 310, 347 [(*Harris*)]; U.S. Const., 14th Amend.; Cal. Const., art. I, §§ 7, 15, 16.)"

A.     *Factual Background*

1.     *Questioning of Dr. Wagner*

At the end of Dr. Wagner's testimony, the trial court asked a series of questions, with the preface, "Well, I have a couple of questions I'd like to ask you, Doctor, just so I understand this."  The court confirmed that Wagner spoke only to appellant and his mother, and asked about the length and circumstances of the conversation with appellant's mother and the length of the interview with appellant.  The court also confirmed Wagner did not rely on any additional materials, other than those

---

[12] *People v. Duckett* (1984) 162 Cal.App.3d 1115, is not to the contrary.  There, the court of appeal concluded the jury could not reasonably reject the evidence of insanity, which included evidence of a history of violence related to the defendant's mental illness and testimony from a non-relative that, before commission of the murder at issue, the defendant described seeing demons, was obsessed with the victim, said she was a "witch," and threatened to kill her.  (*Id.* at p. 1120.)  But similar evidence is not present in this case, and *Duckett* acknowledges "[a] jury may reasonably reject psychiatric testimony on the ground that the psychiatrists did not present sufficient material and reasoning to justify their opinions."  (*Id.* at p. 1119.)

conversations and the jail records. In particular, the court confirmed that Wagner did not have the transcripts of the police interviews and 911 call before he wrote his report. Appellant's counsel objected, and the court overruled the objection. The court said it was "entitled" to ask "clarify[ing]" questions, and "[w]e're all trying to get to one thing and that's . . . the correct decision here."

The trial court continued to question Dr. Wagner, stating, "the other thing I wanted to ask you is this, your opinion is the defendant did not understand what he was doing was wrong when he stabbed the decedent, the victim?" Wagner responded that appellant did not understand "in the moment," and the court asked, "But almost immediately after when he recognized that she was dead he did realize what he had done was wrong?" Wagner responded affirmatively and the court asked, "how do you explain . . . this pact that the defendant says he entered with the victim because he was worried about what he was going to do was wrong so he was going to kill himself?" Wagner said, "Right. I see what you're saying," and the court asked, "Doesn't that show that before he did this he knew it was wrong?"

Appellant's counsel objected and, after the court noted the objection and asked for an answer, Dr. Wagner stated, "The entire notion to me of a pact, a murder-suicide pact, is delusional, um, that rational people don't do that sort of thing. Um, so perhaps that explains to me why even though questions of right and wrong may come up in the context of something like that, it isn't until after the horrible event happens that people, so to speak, snap out of it or come back to reality now." The court said "all right" and then asked, "I guess then the last thing I'd like to know is all of these opinions that you have are premised on . . . believing that the defendant's version of how this occurred is true?" Wagner answered affirmatively and the court followed up, "What I mean by that is, it's premised on believing that the victim asked the defendant to kill her?" Wagner answered affirmatively, and the court asked, "And if . . . hypothetically . . . you did not believe . . . [t]hat that was true, would your opinion be different?" Wagner responded, "I would most definitely have to think about that, yes." Finally, the court asked, "Well, what does that mean? Would your opinion be different, or would you just want to think

about it?" Wagner responded, "I'm going to have to leave it at I would have to think about it, and it probably would be different, yes."

On redirect, defense counsel, among other things, elicited from Dr. Wagner that none of the questions posed by the trial court had changed his opinion appellant was insane at the time of the crime.

2.      *Questioning of Dr. Solomon*

At the end of Dr. Solomon's testimony, the trial court asked a series of questions, starting with, "Am I correct in understanding that in your opinion the explanation that [appellant] gave to the police in the interviews has nothing to do with whether or not in your opinion he was insane at the time he committed this offense?" Solomon hesitated and started saying "the pieces that help me understand that," and the court said, "Can you just answer the question? Did I understand you correctly to say it doesn't matter whether what he was saying was true or not, in your opinion?" Solomon asked, "Which part was true?" and the court responded, "The entire explanation that he gave, that he was doing this because, um, the victim had asked him to do it . . . that they had been in this consensual gathering and that they were drinking and that after a period of time she became depressed and asked him to kill her, that he initially attempted to strangle her, then she asked him to stab her, he explained he felt he might get in trouble, . . . they agreed that, well, if he killed himself, then there would be no consequence to him, no penalty, he thought that sounded okay, so he went ahead and stabbed her?"

Appellant's counsel objected that the question was not presented as a hypothetical, and the court confirmed with Dr. Solomon that the facts the court described are what appellant described to Solomon. The court asked, "Is it your testimony today that it doesn't matter whether any of that was true or not, he still is insane at the time he committed this offense?" After some back and forth the court clarified its question, asking "I'm saying, . . . hypothetically if none of that is true, none of it, and he killed her, for example, hypothetically, in a sexual assault . . . ." Appellant's counsel again objected and was overruled. After a brief further exchange, Solomon answered, "Yes. Because I'm pretty firm in my conviction that this is how he understands it. Although, uh, each

17

time he talked about it, more details come out. But it doesn't change the overall opinion." The court concluded that line of questioning by stating, "Okay. So - - all right. So I understand that, and I just wanted to make sure."

The court then began another line of questioning, asking, "Secondly, you referred several times in making your diagnosis and coming to these conclusion[s] it was important you thought that he had been consistent in his story?" Dr. Solomon answered affirmatively and, over another objection, the court asked Solomon whether he had asked appellant why appellant did not mention hearing voices to the police. Solomon answered, "Um, actually I thought I had the answer already to that. It didn't occur to ask that. He had already explained—he explained several times that every time he's brought up voices he's pretty much discounted and so he tends to hide that. I would not have expected him to bring that up voluntarily. It comes up in a different kind of interview. The fact that he didn't bring it up in this particular context is consistent with what I would expect someone in his position to have done." The court followed up with the question, "When they're explaining why they committed a murder?" Solomon answered, "if he brought it up and emphasized it there, I would be more concerned that he was fabricating, so I sort of see it the opposite." The court said, "All right. Thank you," and offered the parties an opportunity to follow up, which they both declined.

### 3. *Questions from the Jury, Deliberations, and New Trial Motion*

The trial court instructed the jurors with CALCRIM No. 3550, which states in relevant part, "It is not my role to tell you what your verdict should be. Do not take anything I said or did during this trial as an indication of what I think about the facts, the witnesses or what I think your verdict should be." During deliberations, the jury sent the trial court a note asking, "Your Honor, in CALCRIM 222 it states, nothing attorneys ask, discuss or remarks are evidence. However, can we take into consideration while deliberating your comments and/or questions to the witnesses?" CALCRIM No. 222 states in part, "Nothing that the attorneys say is evidence. . . . Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they helped you to understand the witnesses' answers. Do not assume

18

that something is true just because one of the attorneys asked a question that suggested it was true." After consultation with counsel, the court responded, "Neither the questions of the Attorneys <u>or</u> the Court are evidence—They may only be considered to help you understand the witnesses['] answers. It is the testimony of the witnesses that you should consider as evidence."

Subsequently, the jury sent a second note stating, "We are looking to find out what Dr. Wagner based his opinion on. So we'd like to hear when he was examined by [the prosecutor] and when he was questioned by the judge." Appellant's counsel moved for a mistrial, arguing that the court's "very pointed" questioning of the experts had led "the jury to conclude that the Court's opinion is that [appellant] was not being truthful to the doctors." The trial court denied the motion. Appellant's counsel requested that the read-back include the direct examination as well. The court told the jury, "Unless you specifically tell me that you don't want to hear the direct testimony as well, I would be inclined to have you listen to the direct and cross-examination of Dr. Wagner so that you hear perhaps all of the reasons that are given. . . . [T]here may be some reasons raised by [the prosecutor] and other reasons that were raised by the defense." The jury chose to hear the entire examination read back.

The court also told the jury, "The other thing I want to remind you, folks, and I'm going to do this because both of your questions have touched a little bit on the questions that the Court asked during this sanity phase, so I want to remind you again of the following, that it is not my role to tell you what the verdict should be, and you are not to take anything that I said or did during the trial as an indication of what I think about the facts, the witnesses or what your verdict should be. So I just want to remind you of that." After explaining the read-back procedure, the trial court again admonished jurors before they returned to deliberations, "And please keep in mind again that the evidence is the testimony of the witness. The questions that are being asked to the witness are significant only as it helps you understand the answers."

Later, the jury indicated to the trial court that they wanted to "skip further a little forward" after having heard the read-back of part of the first day of the direct

19

examination of Dr. Wagner.  The court instructed the jurors to identify the areas they wished to have the court reporter cover the next day, because the attorneys needed to know what portions were being read back.  Subsequently, apparently without any additional read-back, the jury reached a verdict finding appellant was sane when he killed Harrison.

Appellant moved for a new sanity trial based on the purported impropriety of the trial court's questions to the two experts.  The court denied the motion, noting that it set forth questions to the witnesses for purposes of clarification pursuant to its "right and obligation" to do so.  The court explained that it felt a lot of the issues it raised got "lost" in the extensive questioning from the parties.  The court asked the doctors about the significance of the plausibility of appellant's story "because . . . the jury is entitled to know exactly what it is the doctors are basing their opinions on, and . . . the state of the record before [the court] asked the questions was very confusing."

B.    *Analysis*

"Evidence Code section 775 ' " 'confers upon the trial judge the power, discretion and affirmative duty . . . [to] participate in the examination of witnesses whenever he believes that he may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.' " [Citation.]  . . . The constraints on the trial judge's questioning of witnesses in the presence of a jury are akin to the limitations on the court's role as commentator.  The trial judge's interrogation "must be . . . temperate, nonargumentative, and scrupulously fair. The trial court may not . . . withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power." ' " (*Harris*, *supra*, 37 Cal.4th at p. 350.)[13]  The court may

---

[13] Evidence Code section 775 states, "The court, on its own motion or on the motion of any party, may call witnesses and interrogate them the same as if they had been produced by a party to the action, and the parties may object to the questions asked and the evidence adduced the same as if such witnesses were called and examined by an adverse

20

not "assume the role of either the prosecution or of the defense." (*People v. Cook* (2006) 39 Cal.4th 566, 597.) " ' "Ordinarily the proper course . . . is to allow the examination by counsel—direct, cross, redirect and recross—to conclude, and then if anything in the judgment of the trial court remains obscure, which may be material for the jury to know . . . the trial court may . . . intervene." ' [Citation.] The examination should be 'conducted impartially, so that the jury will not receive improper inferences as to the judge's opinions on the case.' " (*People v. Camacho* (1993) 19 Cal.App.4th 1737, 1744–1745.)

Appellant contends the trial court's questioning was improper because the court effectively allied itself with the prosecution, due to the manner of the court's questions and because the court's questions "essentially replicated questions by the prosecutor on cross-examination." As to the second point, appellant cites no authority that a court oversteps its authority under Evidence Code section 775 merely by asking questions that are arguably duplicative of those asked by a party. The trial court explained it believed that some of the points had become lost or confused in the extensive questioning by the parties. The court did not err in seeking clarification in its questioning, even if a thorough re-examination of the previous questioning could have uncovered the same information. Furthermore, appellant has not shown that all of the areas covered by the court were covered in the prior questioning. For example, appellant points to no portions of the prior questioning where appellant's counsel or the prosecutor elicited *clear* responses from the experts regarding the extent to which their opinions depended on the truth of appellant's description of the killing.[14] For another example, appellant points to

party. Such witnesses may be cross-examined by all parties to the action in such order as the court directs."

[14] The prosecutor elicited testimony from Dr. Solomon that he believed appellant believed Harrison asked to be killed. But the trial court's questioning attempted to clarify more broadly whether it would affect Solomon's opinion if the killing in fact did not occur in the manner appellant described (i.e., if the evidence showed the killing occurred during or following a sexual assault, although the trial court's questions were not so pointed). The court's questioning was not repetitive. Indeed, even the court was unable to elicit a clear answer on the issue.

no portion of the cross-examination where the prosecutor asked Dr. Solomon whether he asked appellant why appellant did not mention hearing voices to the police, which is the initial question posed by the court on that subject.

Appellant also asserts that, to the extent the trial court's questioning elicited new information, it was all adverse to appellant. We agree the answers elicited by the trial court were largely unfavorable to appellant. However, that was not due to the manner of the court's questioning—the court was persistent in its effort to get answers to its questions, but the questions were largely neutrally phrased and the questioning was not unduly adversarial or prolonged. (Cf. *People v. Santana* (2000) 80 Cal.App.4th 1194, 1207 ["the trial court repetitiously, disparagingly and prejudicially questioned defense witnesses" and its questioning "consumed more time than was necessary to elicit the point the trial court sought to make"].) To the extent the court's questions were damaging to appellant, it was because the court's questions exposed that the experts were unable to adequately explain how their opinion that appellant was insane at the time of the killing could still be the same if the killing actually occurred during a sexual assault. As explained previously (Part I, *ante*), that was an important issue in the case. As it was left unclear during the parties' examination of the experts, the trial court properly sought to determine in its questioning to what extent the truth or falsity of appellant's story was relevant to the experts' opinions.[15] For example, in questioning Dr. Solomon, the court

---

[15] Appellant also complains that the court, in its questioning of Dr. Wagner, misleadingly suggested appellant had said before the killing that he knew it was wrong. As explained previously (Part I, *ante*), appellant's statement that he could get in "trouble" did not unambiguously indicate an awareness of moral wrongfulness, but it did suggest a level of mental functioning that arguably undermined appellant's claim of insanity. In any event, the trial court's questioning in that respect was not prejudicial. The trial court instructed the jury not to take the court's questions as reflecting its view of the facts and that its questions were not evidence. (See *People v. Cook*, *supra*, 39 Cal.4th at p. 598 [emphasizing that jury was instructed "of the trial judge's role as an impartial presiding officer whose occasional questions to witnesses were designed to clarify the evidence without favoring either side"].) Moreover, the trial court instructed the jury that a finding of insanity could be based on appellant's inability to understand his act was morally *or* legally wrong. (See Part V, *post*.) We presume the jury followed all those instructions.

persisted in that line of questioning until Solomon explained his opinion did not depend on whether appellant's version of events was what actually happened because Solomon was "pretty firm in [his] conviction that this is how [appellant] understands it." Although that answer left unclear how appellant's schizophrenia might have led him to commit a violent murder during a sexual assault, the trial court did not press the point. Instead, the court said, "Okay. So - - all right. So I understand that, and I just wanted to make sure."

In any event, even if certain of the trial court's questions were improper due to their tone or repetitive nature, it is not reasonably probable the result would have been more favorable to appellant absent the impropriety. (*Harris*, *supra*, 37 Cal.4th at pp. 350–351 [applying reasonable probability standard of *People v. Watson* (1956) 46 Cal.2d 818 to similar claim].)[16] We recognize many of the questions posed by the trial court were significant because they touched on the heart of appellant's claim of insanity; such questioning is perilous and should be undertaken with great caution. However, any adverse effect on appellant was due to the experts' inability to provide adequate answers, not to the manner of the questioning. (See *People v. Cook*, *supra*, 39 Cal.4th at p. 598 ["Although answers by two witnesses . . . to the trial court's questions may not have been favorable to the defense, the questions themselves did not create the impression that the court was allied with the prosecution."].) In particular, as explained in Part I, the expert testimony left a huge analytic gap because the experts failed to explain how a conclusion

---

(*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) For the same reasons, we reject appellant's contention that the trial court's questions misled the jury as to the legal standard governing the sanity determination.

[16] In *People v. Cook*, *supra*, 39 Cal.4th 566, the Court stated in regard to a similar claim, "even were we to assume the court's questions were improper, any error was harmless beyond a reasonable doubt." (*Id.* at p. 599, citing *Chapman v. California* (1967) 386 U.S. 18, 24.) *Cook* did not actually decide whether the *Chapman* standard of review applies to claims of improper judicial questioning and did not question its application of the *Watson* standard of review in *Harris*, decided one year before. (*Cook*, at p. 599; *Harris*, *supra*, 37 Cal.4th at pp. 350–351.) Because any impropriety in the court's questioning did not deprive appellant of a fair trial in violation of the federal constitution, we follow *Harris* in applying the *Watson* standard for review of state law error. But our conclusion would be the same under either standard of review.

23

appellant was insane is consistent with a scenario in which appellant killed Harrison in a sexually-related violent attack and then invented a story about a suicide pact. The trial court's questions were not calculated to pointedly expose that gap, but the court did properly seek clarification on how it would affect the experts' opinions if the killing did not occur in the manner appellant claimed. Any improper aspects of the trial court's questions were harmless, particularly in light of the court's very clear instruction not to take anything it said "as an indication of what [it thought] about the facts, the witnesses or what [the jury's] verdict should be." (See *Cook*, at p. 598 [relying on similar instruction in prejudice analysis]; *Harris*, at pp. 350–351 [same].)

III.    *Appellant Has Not Shown the Prosecutor's Questioning Regarding A Publication Not in Evidence Was Reversible Error*

During the cross-examination of Dr. Wagner in the sanity trial, the prosecutor asked a series of questions about the difficulty in determining whether a patient is malingering. The prosecutor asked Wagner if he agreed "studies have shown that it's fairly easy to fake certain mental illnesses." Wagner responded in part, "I don't know that it's easy to do that. I would have to be familiar with the studies. I've seen people try to fake illnesses, and it was pretty bad. I've seen other people do it, and they're really quite good. I'm not familiar with the—maybe you have the data on that. I don't know." The prosecutor then asked Wagner whether he would agree there is "considerable controversy amongst psychologist[s] about accurately being even able to . . . diagnose mental illness." Wagner responded that he would not say there is "a lot of disagreement about it."

The prosecutor then proceeded to ask Dr. Wagner whether he was familiar with three particular publications and/or studies. Wagner testified he had not read the first book the prosecutor mentioned. The prosecutor then asked, "Are you familiar with the works of Margaret Hagen?" Wagner said he had heard her name before. The prosecutor then asked, "She wrote a book called Whores of the Courts, and she talks about psychiatric testimony in the courtroom and how it's really difficult basically to . . . predict somebody's mental state?" Defense counsel objected "to counsel testifying," and

24

the trial court overruled because it was a "hypothetical question." Following a second identical objection, Wagner proceeded to acknowledge it is "hard" to determine somebody's state of mind at a particular moment. The prosecutor then asked Wagner about a study involving people faking mental illness; Wagner said he was aware of the study.

On appeal, appellant contends the trial court erred in permitting the prosecutor to ask Dr. Wagner about Margaret Hagen's book because it permitted the prosecution to "introduce the hearsay opinion of a nontestifying witness—Margaret Hagen—that it is very difficult to assess a person's mental state at the time of a crime, as well as her apparent opinion that experts who attempt to do so are 'whores.' " He contends the questioning violated Evidence Code section 721, which prohibits cross-examination of an expert on the content of a publication unless the witness relied on the publication, it has been admitted in evidence, or it has been established as a reliable authority. (See also *McGarity v. Department of Transportation* (1992) 8 Cal.App.4th 677, 683.)[17]

Assuming the trial court erred (see *People v. Visciotti, supra*, 2 Cal.4th at p. 81), it is not reasonably probable appellant would have obtained a more favorable result absent the error (*People v. Watson, supra,* 46 Cal.2d at p. 836).[18] Dr. Wagner *agreed* with the proposition that it is difficult to determine someone's mental state, without hesitation. He explained, "I think that these are very difficult cases to know . . . exactly the state of the mind of any us when we are doing anything, but particularly in this particularly high stakes, if you will, situation. It is hard." Because Wagner readily agreed with the point,

---

[17] We reject the People's contention that the claim has been forfeited because appellant's counsel failed to refer to Evidence Code section 721 in stating his objection. The objection that the prosecutor was "testifying" adequately communicated to the trial court that the concern was that the questioning improperly put the non-testifying expert's opinion before the jury. (See *People v. Visciotti* (1992) 2 Cal.4th 1, 81 [discussing Evidence Code section 721 objection and stating, "party may not by its questions testify regarding the content of that material"]; cf. *People v. Demetrulias* (2006) 39 Cal.4th 1, 22 [counsel "cannot make a 'placeholder' objection stating general or incorrect grounds"].)
[18] We reject appellant's assertion that any error in admitting the reference to Hagen's book violated appellant's federal constitutional rights to due process and a fair trial.

25

there is no basis to conclude the prosecutor's brief reference to Hagen's conclusion caused appellant any prejudice.  (See *McGarity*, *supra*, 8 Cal.App.4th at p. 683 [explaining that the primary purpose of Evidence Code section 721, subdivision (b) is "to prevent an adverse party from getting before the trier of fact the inadmissible hearsay views of an absent expert, *which may be contrary to the expert witness' opinion*"] (emphasis added).)

Further, the title of the book alone, without elaboration, did not communicate any clear message to the jury.  Even assuming the jury linked the title to experts, there was no basis to infer whether Hagen believed all experts were "whores" or only certain experts in certain circumstances.  Further, there is no reason to believe the jury gave any weight to any message implied by the title.  Notably, the jury was aware that the testifying witness, Dr. Wagner, was appointed by the court rather than retained by the defense.[19]  And there is no basis to conclude the jury would have had the title of Hagen's book in mind in considering the subsequent testimony of the expert the defense did retain, Dr. Solomon. The prosecutor argued in her closing that Solomon's testimony was less reliable because he was a paid witness; that argument was not meaningfully more potent simply because the jury heard there was a book titled <u>Whores of the Court</u>.

Because any error was harmless, appellant's claim fails.

IV.     *Appellant Has Not Shown The Prosecutor's Questioning About Appellant's Motivation to Lie Was Improper*

During the sanity trial cross-examination of Dr. Solomon, the prosecutor asked whether appellant had a motive to lie to the doctor.  Solomon responded that, since appellant "never said to me that he was trying to evade culpability or guilt, I'm not sure what the purpose of him lying would be."  The prosecutor asked whether a person facing murder charges would have a motive to lie to avoid going to prison.  Solomon responded that appellant might be an "exception" because appellant said he expected to go to prison

_____

[19] Because the significance of the title was unclear and did not, in any event, appear to apply to Dr. Wagner, we reject appellant's assertion that the questioning was equivalent to permitting Hagen to opine on Wagner's credibility.

26

and should be sent to the gas chamber for killing Harrison. The prosecutor asked whether the fact that defendant pled not guilty by reason of insanity showed that appellant had changed his mind about going to prison. Defense counsel objected on the basis that the prosecutor was "arguing punishment." The trial court overruled the objection, reasoning "the matter under question is whether . . . the doctor feels [appellant] had a motive to lie. If the doctor doesn't think there's any difference between prison and a hospital setting, then the . . . prosecution is entitled to go into that." The prosecutor then asked, "you're saying that . . . you think that he demonstrated that he wanted to go to prison, right?" Solomon responded that appellant expected to be imprisoned and was not asking to be released. The prosecutor then obtained Solomon's agreement that "[a]t this point [appellant has] entered a plea of . . . not guilty by reason of insanity" and "that's the difference between going to State Prison and a hospital."

On appeal, appellant contends the prosecutor's questioning was improper because it effectively "invited jurors to draw an adverse inference from [appellant's] entry of a plea of not guilty by reason of insanity, his presentation of an insanity defense, and his exercise of his right to a jury trial on this issue. . . . [T]he prosecutor here suggested that jurors infer, from [appellant's] insanity plea, that he had a motive to lie." (See *United States v. Whitten* (2d Cir. 2010) 610 F.3d 168, 194–196 (*Whitten*) [prosecutor improperly used the defendant's demand for a trial as evidence of lack of remorse and refusal to accept responsibility].)

"Under the 'unconstitutional conditions doctrine,' 'the government may not do indirectly what it cannot do directly.' [Citation.] The doctrine keeps the prosecution from 'trench[ing] on [a] defendant's constitutional rights and privileges.' [Citation.] 'The prosecution cannot use the defendant's exercise of specific fundamental constitutional guarantees against him at trial.' " (*Whitten*, *supra*, 610 F.3d at p. 194.) Although the United States Supreme Court has not ruled on whether the federal constitution mandates that states provide defendants an insanity defense (*Clark v. Arizona*, *supra*, 548 U.S. at p. 752, fn. 20), we assume for purposes of the present

27

decision that the prosecution could not use appellant's exercise of his right to plead insanity against him. That is not, however, what occurred in the present case.

The jury was ultimately instructed that, "[i]n evaluating the believability of an expert witness . . . consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable or unsupported by the evidence." One of the primary sources of information supporting Dr. Solomon's opinion was the statements of appellant, both to the doctor and to the police. By inquiring whether appellant had a motive to lie, the prosecutor's questioning was calculated to probe the reliability of Solomon's opinion. Indeed, Solomon testified that, in determining whether he believes what an interviewee is saying, he "ha[s] to look at each statement to try to figure out what it would be for." Following that testimony, the prosecutor suggested appellant did have a motive to lie, and Solomon disagreed, stating "since he never said to me that he was trying to avoid culpability or guilt, I'm not sure what the purpose of him lying would be." The questioning that led to the references to appellant's plea followed, as the prosecutor sought to rebut Solomon's assertion that appellant did not care whether he went to prison. Thus, the questioning at issue properly sought to show that Solomon was relying on unreliable information, rather than to penalize appellant for asserting his right to plead insanity.

*People v. Bunyard* (1988) 45 Cal.3d 1189, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, is instructive. There, the defendant contended the prosecutor "committed misconduct by arguing that defendant was an 'interested party' and that the jury should consider his interest and motive to lie when assessing his credibility." (*Bunyard*, at p. 1222.) The Supreme Court concluded the prosecutor's comments were derived from the evidence and proper. (*Ibid.*) The Court also concluded the jury was free to consider anything relevant in assessing the truthfulness of the defendant's testimony, including any motive to lie. (*Id.* at p. 1223.) Similarly, in the

28

present case, any motive appellant had to lie was highly relevant to the jury's determination of the weight to accord to Dr. Solomon's opinion.

The trial court properly overruled appellant's objections to the prosecutor's questioning of Dr. Solomon about appellant's motive to lie.[20]

V.      *The Trial Court Did Not Err in Instructing the Jury With CALCRIM No. 3450*

As noted previously, it is well established that a "defendant who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful." (*Skinner*, *supra*, 39 Cal.3d 765, 783; *Torres*, *supra*, 127 Cal.App.4th at pp. 1401–1402.)  Thus, a defendant can show he was insane at the time of commission of an offense if he can show he was incapable of understanding his action was morally wrong, even if he knew his action was legally wrong.  Appellant contends the trial court erred in instructing on the elements of the insanity defense using CALCRIM No. 3450 because, under his grammatical analysis, the instruction required appellant to show he was incapable of understanding that killing Harrison was both morally *and* legally wrong.  Appellant's claim fails.

A.      *General Principles Regarding Claims of Instructional Error*

"It is settled that, even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.)  "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible

---

[20] In any event, the alleged error is harmless under any standard.  The jury was aware that appellant had pled not guilty by reason of insanity and was instructed that, if the jury found he was insane at the time of the crime, he would "remain in a mental hospital or outpatient program, if appropriate."  Thus, the prosecutor's questions introduced no new information.  Moreover, the prosecutor did not belabor the point and her questions stayed focused on probing whether Dr. Solomon adequately considered and accounted for the possibility that appellant was lying.

29

manner.  [Citations.]"  (*People v. Wilson* (2008) 44 Cal.4th 758, 803–804.)  "The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury."  (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) We presume the jurors are intelligent and capable of understanding and correlating all the instructions given to them.  (*People v. Riley* (2010) 185 Cal.App.4th 754, 767.)

      B.    *Analysis*

      The trial court instructed the jurors with CALCRIM No. 3450, in relevant part, as follows:

      "You have found the defendant guilty of Murder.  Now you must decide whether he was legally insane when he committed the crime.

      "The defendant must prove that it is more likely than not that he was legally insane when he committed the crime.

      "The defendant was legally insane if:

      "1.  When he committed the crime, he had a mental disease or defect;

      "AND

      "2.  Because of that disease or defect, he was incapable of knowing or understanding the nature and quality of his act or he was incapable of knowing or understanding that his act was morally or legally wrong."

      Appellant argues CALCRIM No. 3450 informs jurors that, "with respect to the right/wrong prong, the defendant must prove that he was incapable of knowing or understanding that his act was morally wrong *and* that he was incapable of knowing or understanding that his act was legally wrong."  He reasons that "[a]s a matter of logic and English grammar," when the court told the jury appellant was required to show he was incapable of understanding "that his act was morally or legally wrong," the jury necessarily understood that to mean he had to show he was incapable of understanding *both* the moral *and* the legal wrongfulness of his act.[21]

---

[21] Appellant did not object to the instruction as written or request a clarifying instruction. A defendant may not contend on appeal that jury instructions are impermissibly ambiguous without first requesting a clarifying instruction at trial.  Failure to make such a

30

To support that assertion, appellant asserts as a rule of English grammar that "when preceded by a negative, 'or' is conjunctive. In other words, 'not A or B' is the same as 'not A and not B.' " Applied to the instruction at hand, his claim is that, when the jury was instructed he had to prove he was "incapable of . . . understanding that his act was morally or legally wrong" it was equivalent to instructing the jury he had to prove he was "incapable of understanding that his act was morally wrong *and* incapable of understanding that his act was legally wrong." To support this proposition he quotes from Henry Fowler's English language usage dictionary, where it was observed that "[T]here is much difference between *without falsehood or deceit* (which implies that neither is present) and *without falsehood or without deceit* (which implies only that one of the two is not present)." (H.W. Fowler, The New Fowler's Modern English Usage (3d ed. 1996, p. 555 (New Fowler's).)[22] However, appellant's argument at the most establishes that the instruction is ambiguous. Appellant cites no authority that we must assume the jury construed the instruction consistent with Fowler's grammatical observation, circa 1926. (See New Fowler's, at p. vii.) New Fowler's itself states that the grammatical " 'rule' " observed by Henry Fowler "[i]n practice . . . is not to be literally applied." (*Id.* at p. 555.) The instruction is at least equally susceptible to a construction that the "or" between morally and legally actually means "or." (See *People v. Alselmi* (1890) 85 Cal. 434, 435 [in determining whether jury was misled by language in an instruction, courts "must consider it by the light of common understanding, rather than the strict rules of grammar, and also in connection with its context"]; see also *People v. Kelly* (1992) 1 Cal.4th 495, 536 ["We believe, however, that the standard instruction is

---

request forfeits the claim on appeal. (*People v. Hart* (1999) 20 Cal.4th 546, 622.) Nonetheless, appellant urges that we review the issue because the asserted error affected his substantial rights by misstating the sanity test. (Pen. Code § 1259; *People v. Rogers* (2006) 39 Cal.4th 826, 881, fn. 28.) To determine whether that is so, it is necessary for this court to consider appellant's claim on the merits.

[22] Appellant also cites to Willard Van Orman Quine's Elementary Logic (Harvard Univ. Press 1980), first published in 1941. However, the cited portions do not set forth the broad rule of grammar appellant asserts. (See *id.* at p. 13; see also *id.* at p. 14 [referring to "[t]he ambiguity of 'or' "].)

sufficiently clear. If defendant believed the jury might engage in the same tortuous grammatical analysis as he does on appeal, . . . he should have requested" a modification].)

Assuming that the instruction is ambiguous, there is no reasonable likelihood the jury understood CALCRIM No. 3450 in the way appellant suggests. In his closing argument, defense counsel discussed the sanity instruction and noted there were two elements—first, that appellant has a mental defect, and, second, that due to that defect appellant was incapable of understanding the wrongfulness of his act. As to the second element, counsel emphasized that the language of the instruction ("incapable of knowing or understanding the nature and quality of his act or was incapable of knowing or understanding that his act was morally or legally wrong") provided for "multiple ways in finding the defendant was not legally sane." Counsel also expressed the pertinent question *without* the negative phrasing that appellant emphasizes on appeal, stating "the question [Dr. Wagner] was asked by the Court was the same question that you as jurors are now being asked to decide. At the time . . . the murder was committed, did [appellant] know or understand that his act was morally or legally wrong . . . ." Counsel subsequently repeated that characterization of the required showing in discussing Dr. Solomon's testimony.

Furthermore, the prosecutor did not suggest in her closing argument that appellant's knowledge of the legal wrongfulness of his act was sufficient to defeat his claim of insanity. Her principal argument on the issue of wrongfulness was that, "Every shred of evidence in this case shows that [appellant] knew what he was doing was wrong. In fact, he made a pact with her, remember that, when he said, this is wrong and I'm going to get in trouble, right. So they made this pact where, okay, so because of that, I'm going to go ahead and kill myself. Remember that pact. So he knew what he was doing was wrong beforehand, and you know, based on his own words afterwards, that he knew what he was doing was wrong because, well, he told the police he knew he was a bad person. That shows he knew what he was doing was morally wrong, and you have every single statement afterwards that shows that he knew what he was doing was legally

32

wrong because the very first thing he tells the 9-1-1 operator is I'm guilty, come and get me." Nowhere in that passage did the prosecutor suggest appellant had to show he knew the act was *both* morally *and* legally wrong. It would have been easy for the prosecutor to argue that appellant's statement about getting in trouble showed he knew the act was legally wrong and, thus, the jury was obligated to reject appellant's insanity claim. Instead, the prosecutor argued the evidence showed appellant understood both the legal and moral wrongfulness, which communicated to the jury that appellant's insanity claim could be based on *either* ground.

Because appellant has not shown it is reasonably likely the jury misunderstood CALCRIM No. 3450, his claim fails.[23]

## VI.   *The Trial Court Did Not Err in Refusing to Discharge the Venire or Provide an Admonishment During Voir Dire*

Appellant contends the trial court erred in refusing to discharge the jury panel after a prospective juror made reference to the release of a person who killed a friend of hers and was found insane, and in failing to admonish the prospective jurors they would not be able to consider the consequences of an insanity finding. We reject the claim.

### A.   *Factual Background*

During voir dire, a prospective juror revealed there was "something that I had experienced in my life that might affect my feelings towards this whole thing." The trial court asked her if she would prefer to discuss the matter at the bench, and she said, "I don't mind speaking about it. . . . I have a friend who was murdered by her son, and it was an insanity plea; and it was very upsetting to me. And several years later he was out,

---

[23] We also reject appellant's parallel contention that CALCRIM No. 3450 prejudicially misinformed the jury he had to show he was *both* incapable of knowing *and* incapable of understanding the wrongfulness of his act. Even assuming there is a reasonable likelihood the jury so misunderstood the instruction, any misunderstanding was harmless. Appellant points to nowhere in the record where counsel or any witness made a distinction between appellant's capacity to know and his capacity to understand the wrongfulness of killing Harrison.

so that's upsetting to me." She said either the murder or the release had happened in 2001. The prospective juror was excused.

The following day, defense counsel asked the trial court to discharge the panel, arguing that the prospective juror's statement had prejudiced the venire. The court denied the motion, noting counsel had not objected the day before and the statement was "a very short comment made in passing." Counsel then asked the court to read a portion of CALCRIM No. 3450 explaining that, if the jury found appellant insane at the time of the crime, he would not be released until a court found he qualified under the law, as well as a portion of the instruction informing the jury that it "must not let any consideration about where the defendant may be confined or for how long affect [its] decision in any way." The court denied the request. The court had previously addressed that possibility, commenting that "even mentioning it now before the jury would be more harmful than helpful" and indicating that it would instruct the jury "at the appropriate time that the jurors are not to concern themselves with any of the consequences of [an insanity] finding."

At the conclusion of the sanity trial, the trial court instructed the jury pursuant to CALCRIM No. 3450: "If you find the defendant was legally insane at the time of his crime, he will not be released from custody until a court finds he qualifies for release under California law. Until that time he will remain in a mental hospital or outpatient treatment program, if appropriate. He may not, generally, be kept in a mental hospital or outpatient program longer than the maximum sentence available for his crime. If the state requests additional confinement beyond the maximum sentence, the defendant will be entitled to a new sanity trial before a new jury. Your job is only to decide whether the defendant was legally sane or insane at the time of the crime. You must not speculate as to whether he is currently sane or may be found sane in the future. You must not let any consideration about where the defendant may be confined, or for how long, affect your decision in any way." After closing arguments and before deliberations, the trial court instructed the jury pursuant to CALCRIM No. 3550 that, "You must reach your verdict without any consideration of punishment."

34

B.    *Analysis*

Appellant asserts the prospective juror's comments were equivalent to an improper suggestion that appellant would be set free if found not guilty by reason of insanity. (See *People v. Babbit* (1988) 45 Cal.3d 660, 704.) He contends the prospective juror's comments biased the jury against his insanity defense and denied him a fair trial on the issue of sanity.

Appellant fails to appreciate that discharge of the venire is a "drastic remedy" and the trial court "possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required." (*People v. Medina* (1990) 51 Cal.3d 870, 889.) *Medina* explained, "discharging the entire venire is a remedy that should be reserved for the most serious occasions of demonstrated bias or prejudice, where interrogation and removal of the offending venire persons would be insufficient protection for the defendant." (*Ibid.*) In *Medina*, prospective jurors made very inflammatory comments (apparently while court was not in session) reflecting prejudgment of the defendant, including " 'even his own lawyers think he's guilty' " and " 'bring the guilty S.O.B. in, we'll give him a trial, and then hang him.' " (*Id.* at p. 888.) Nevertheless, the trial court did not err in refusing to discharge the entire venire, where it had identified and excused the offending prospective jurors. (*Id.* at p. 889.)

In the present case, the prospective juror's comments reflected her personal discomfort with serving on the jury. She was excused from service. The issue did not come up again during voir dire, and appellant points to no place in the record suggesting any other juror was influenced by the comments at issue. (See *People v. Ramos* (2004) 34 Cal.4th 494, 515 ["there is no indication that" prospective juror's remarks "affected the other prospective jurors"].) Appellant has not shown the trial court abused its discretion in refusing to discharge the entire venire.

Neither has appellant shown the trial court abused its discretion in refusing to admonish the venire. It was not unreasonable for the trial court to conclude it would be more harmful than beneficial to bring up the issue again, given that the original exchange

was very brief and no other juror had raised any concern about punishment. As the California Supreme Court has observed, " '[A]s a general matter, it is unlikely that errors or misconduct occurring during voir dire questioning will unduly influence the jury's verdict in the case. Any such errors or misconduct "prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings, before its attention has even begun to focus upon the penalty issue confronting it." ' " (*People v. Seaton* (2001) 26 Cal.4th 598, 636.) The same reasoning applies to problematic comments made by prospective jurors. The trial court knew the jury would be instructed not to consider punishment before deliberations on the sanity issue, and the trial court indeed did instruct the jury using the language of CALCRIM No. 3450 at that time.[24]

## DISPOSITION

The judgment is affirmed.

---

[24] Appellant criticizes CALCRIM No. 3450 in various respects, but only in the context of arguing that the alleged error in failing to discharge or admonish the venire was prejudicial. Because there was no error, we need not and do not address appellant's criticisms of CALCRIM No. 3450.

We also reject appellant's claim of cumulative prejudice; the few arguable errors we have identified were, even in combination, of little significance in light of the evidence supporting the jury's verdict.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

NEEDHAM, J.

(A140625)